[No. H037182. Sixth Dist. Jan. 28, 2013.]

THE PEOPLE, Plaintiff and Respondent, v.
RONALD CUEVAS, Defendant and Appellant.

COUNSEL

Jonathan Grossman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Masha A. Dabiza, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

MÁRQUEZ, J.—

## 1. INTRODUCTION

Under statutes in effect in March 2011, a person could be committed involuntarily to the State Department of Developmental Services (Department) for up to one year after a petition alleged (Welf. & Inst. Code, former § 6500; Stats. 1996, ch. 1076, § 5, p. 7265)[1] and a court found "that the person is mentally retarded, and that he or she is a danger to himself, herself, or to others." (Former § 6509; see Stats. 1996, ch. 1076, § 8.5, p. 7268.)[2] That is what has happened in this case with Ronald Cuevas.[3] After a petition and a court trial, the court committed Ronald to the director of the Department for a year beginning on July 11, 2011.[4]

On appeal, Ronald asserts there were constitutional defects in his commitment. He argues that *People v. Bailie* (2006) 144 Cal.App.4th 841 [50 Cal.Rptr.3d 761] (*Bailie*) and *People v. Sweeney* (2009) 175 Cal.App.4th 210 [95 Cal.Rptr.3d 557] (*Sweeney*) require the petition to allege and the court to find not simply that he is mentally retarded and dangerous, but that his mental

---

[1] Unspecified section references are to the Welfare and Institutions Code. We will refer to versions of the relevant statutes in effect in March 2011.

[2] We will use the phrase "mentally retarded" in this opinion as it was part of the statutory scheme at the time of this commitment as it has been since 1971. (Stats. 1970, ch. 351, § 3, p. 765.) We recognize that recent legislation has replaced this phrase in section 6500 with "person with a developmental disability." (Stats. 2012, ch. 25, § 19.)

[3] We seek to unambiguously characterize Ronald Cuevas in this opinion. He has the same last name as his twin brother Rodney and his mother Ruby, both of whom testified at trial. With no disrespect, to avoid any ambiguity we will refer to him as Ronald.

[4] During the pendency of this appeal, Ronald's one-year commitment under section 6500 has expired. We will follow in the footsteps of other courts that have not dismissed such appeals due to technical mootness so that the important issues presented do not evade review. (E.g., *Money v. Krall* (1982) 128 Cal.App.3d 378, 392 [180 Cal.Rptr. 376].)

retardation is a cause of his dangerousness. He also asserts that there was insufficient evidence to support such a finding.

Ronald originally also contended that he was entitled to a jury trial as he did not personally waive jury trial after receiving judicial advice of his right. In supplemental briefing, however, Ronald has conceded that the California Supreme Court has recently held that neither due process nor equal protection requires judicial advice or personal waiver of the right to a jury trial by a person alleged to be mentally retarded. (*People v. Barrett* (2012) 54 Cal.4th 1081, 1105–1106, 1109 [144 Cal.Rptr.3d 661, 281 P.3d 753] (*Barrett*).)

In response to our requests for supplemental briefing, the parties agree that section 6500 should be construed to authorize commitment only if a person's "mental retardation [i]s a substantial factor in causing her serious difficulty in controlling her dangerous behavior." (*Sweeney, supra*, 175 Cal.App.4th 210, 225.) The Attorney General further acknowledges that "neither of the experts explicitly stated that [Ronald's] mental retardation was a substantial cause or factor in his dangerous lack of self control," but nevertheless asserts that the evidence supports that conclusion. The Attorney General does not assert that the petition included such an allegation or that the trial court expressly made such a finding.

■ After reviewing the record, we will agree with Ronald that he should not have been committed under the existing legal standard, as there was no substantial evidence that he has a dangerous lack of self-control resulting from his mental retardation. For the reasons stated more fully below, we will reverse the commitment order.

## 2. TRIAL COURT PROCEEDINGS

### A. *Petition*

On March 15, 2011, the Santa Clara County District Attorney filed a petition asking the court to commit Ronald Cuevas "to involuntary treatment at California Psychiatric Transitions (CPT) for a period not to exceed one year." The petition was based upon reports from the San Andreas regional center and the Department which concluded, among other things, "that Respondent is a person mentally retarded and is a danger to himself or others." The petition was requested by Vasantha Siddappa, a service coordinator from the regional center, which was responsible for the care, support, and maintenance of Ronald. Ronald was then residing in the Barbara Arons Pavilion (BAP), the mental health wing of Valley Medical Center in San Jose. Attached to the petition were confidential documents including a nine-page typed declaration by Siddappa reviewing Ronald's history since birth in

January 1966, with emphasis on the psychological treatment he had received since 1992, and a four-page typed psychological evaluation and diagnosis by a psychologist, Dr. Gerri Walker.

## B. *Pretrial Proceedings*

On March 15, 2011, the court made a temporary order placing Ronald in the custody of the director of the Department for placement at California Psychiatric Transitions (CPT) upon his release from BAP. This order was renewed on March 22, 2011. Court trial was originally scheduled for April 4, 2011, but was continued to June 9, with a readiness hearing on May 23.

On May 23, 2011, Ronald, his brother Rodney, his psychologist, and his caseworker, Siddappa, appeared. The People agreed to return Ronald home for two weeks so long as Rodney promised to provide 24-hour supervision. The June 9 trial date was vacated.

On June 6, 2011, after an in-chambers hearing, Ronald was returned to BAP, and trial was scheduled for July 11.

## C. *Court Trial*

### (1). *The People's evidence*

Court trial was held on July 11, 2011. The People presented one witness, Gerri Walker, a clinical psychologist who had been part of Ronald's treatment team since March 2011. Over objection, the court also accepted into evidence the report on which the petition was based, including Walker's own evaluation and diagnosis of Ronald and his caseworker's review of his treatment history.[5]

There was no dispute at trial that Ronald is mentally retarded. Walker's written report described Ronald's mild intellectual disability secondary to hydrocephaly at birth. She testified that "[h]is intellectual cognitive functioning is such that he is labeled as mental retardation" or having developmental delay. Walker testified further that Ronald's mental health diagnosis is "paranoid psychosis NOS" (not otherwise specified) with delusional ideation.

### A. *Ronald's History Since 1992*

The caseworker's report provided the following history for Ronald from 1992 through the filing of the petition in March 2011. Signs of mental illness

---

[5] As noted in part 2.A., both documents were initially submitted as confidential. On appeal, both sides cite to the report and appear to assume that the contents are in evidence and no longer confidential. We will proceed on that basis. To the extent that Ronald relies on the report in his brief, he has waived its confidentiality. (Evid. Code, § 912.)

manifested on August 23, 1992, when Ronald had a violent outburst in his family home, threatening to kill himself or his twin brother Rodney. He was reported as delusional as early as 1999, admitting to hearing voices of people at night who he thought were coming into his house to steal his checks. He called people on the phone incessantly.

On August 19, 2010, the police were called by the crisis support team in response to a serious telephone threat by Ronald.

On September 24, 2010, Ronald discontinued taking Abilify along with other medications, as he had sometimes done since he began taking Abilify in 2004. On October 21, 2010, his treatment team agreed to a trial period of not taking Abilify. His thinking was reported to be much clearer for a few weeks, but paranoia and delusions eventually recurred.

In November 2010, Ronald had to relocate from an apartment in which he had lived for many years. He moved into an apartment in Campbell owned by his parents. He was delusional about his parents coming into his apartment and taking his papers. He believed his mother was coming in through the front door and the window and taking his money and other items. He also thought the neighbors were taking his groceries. He was reported to be making excessive phone calls to the Campbell Police Department, his mother, the caseworker, crisis support services, and staff from the day program and supported living services. Neighbors reported him as talking and yelling on the telephone at all hours of the night. He often refused help with cleaning his apartment, shopping for groceries, and planning and making meals.

In March 2011, a court investigator and support personnel who worked with Ronald reported that he was leaving phone messages about death, the death penalty, the death penalty for his parents, his personal disappearance and regret at being born.

According to Walker's written evaluation, on March 9, 2011, Ronald's mother called the police after he left notes asking other tenants not to take things from his apartment. He also left one of his medications at the doorstep of a neighbor with young children. He told his mother if the children ingested the pills, they would know how he feels when he takes them. On March 10, 2011, he was taken to BAP. On March 11, 2011, Ronald told Walker and Siddappa that he wanted to give his neighbors one pill and his parents another pill that would do them harm. He told Walker that he was in the

hospital because he had tried to prevent his neighbors from breaking into his home and because his parents were stealing his money from the bank.[6]

## B. Testimony of Clinical Psychologist Gerri Walker

Clinical Psychologist Gerri ·Walker testified that Ronald's parents live in Lake County. He had threatened to kill his mother without saying how he would. He did not want her to be his conservator. His residence was dirty because he did not want support services coming in to clean it.

Walker described the failure of the trial home placement of Ronald that began on May 23, 2011. After his brother Rodney promised to provide full-time supervision, Rodney left town within the first 24 hours. Ronald became assaultive with Rodney and locked him out of the apartment. Ronald lost track of what day it was, did not take his medication, and became delusional. He found an empty medication container for his father and became upset that his father was trying to poison him. He called the police department multiple times. "It escalated and then he was 5150-ed."[7]

The workers at BAP reported that Ronald had to be restrained after spitting at and pushing a person. He was most recently restrained on June 16, 2011.

In Walker's opinion, Ronald "would be a risk to himself" if not placed in a secure facility like BAP "because he continues to have the delusional ideation. He continues to think that things are happening that are not. He still has poor anger management and he becomes very upset when things don't go his way. And because of that, it would be a risk for him and others who are around him." Based on his history, Walker testified that Ronald would not be medication compliant without supervision. Walker was not asked whether Ronald's mental retardation was a cause of his delusions or paranoid psychosis.

On cross-examination, Walker acknowledged that Ronald does not have command delusions that tell him to harm himself or others. She also acknowledged that Ronald's phone calling had not placed anyone in danger, and he has not actually harmed himself or threatened to do so.[8] But she testified that Ronald "is a danger to himself because he does—I know that he has walked in crosswalks and put up his hands, and someone could easily run him over."

---

[6] Additional details about Ronald's history from the written reports by the caseworker and the psychologist are provided below in part 5. where relevant to the analysis.

[7] The record contains confidential paperwork about a section 5250 certification on June 9, 2011, that the parties do not discuss in their briefs.

[8] Walker apparently did not recall at trial the episode in August 1992 when Ronald threatened to kill himself or his brother.

(2). *Defense evidence*

A. *Ronald's Testimony*

Ronald testified on his own behalf. He admitted that when he was recently placed at home he did not want his brother in his apartment. He remembered that he locked Rodney out after an altercation, but he did not remember why. He remembered Rodney leaving for about 12 hours.

He also remembered that he stopped taking Abilify the prior September. He said both that he stopped taking the medication for one day because it was too much for him and that he was off it for a couple of months. He was taking it at the time of trial and would continue to do so, along with his other medications. His problems with Rodney had been resolved. He would like to live in his apartment and is willing to accept help from support services. And he testified that he called the regional support center "[o]nce in a great while" about receiving his money.

B. *Rodney's Testimony*

Ronald's twin brother Rodney explained that his brother had lived for 12 years in another apartment with the help of a day program that came to Ronald's house and an in-home program to keep the house clean and take him grocery shopping. Ronald subsequently moved into a Campbell apartment owned by their parents.

Rodney admitted that he heard the court tell him that he was to supervise Ronald 24 hours a day during his recent release. He explained that the release was sudden, so, while Ronald was sleeping the morning after the release, Rodney went home to Tracy for some clothes and his telephone charger.

Rodney denied telling the regional center that Ronald had locked him out of the house. In fact, Rodney has keys to the house. He denied that Ronald had ever told him to get out of the house or been argumentative. But there were times when Ronald did not want Rodney's help and told him to go back to his family.

Ronald had voiced his opinions and concerns about finances, but he had never been assaultive or aggressive with another person.

Rodney blamed himself for Ronald not taking his medication during his recent home placement. Rodney was not sure when Ronald was supposed to take which medication and Rodney did not have the help of the regional center. He learned from Ronald that medications had to be taken together to

counteract each other's side effects. One day they disagreed about whether Ronald had taken his medication. Ronald was insistent but Rodney was able to convince him of what day it was. One time, "he found that medication bottle, and you know, he naturally thought—well, I shouldn't say naturally—but he thought that my parents were trying to poison him." Rodney had noticed that Ronald became more agitated when he was on higher dosages of Abilify in secure facilities.

## C. Ruby's Testimony

Ronald's mother Ruby testified that she and her husband are coconservators of Ronald. They own a fourplex in Campbell. Ronald started living there on November 2, 2010. He had to move because his prior apartment was being renovated. In her opinion, he received minimal support services as far as taking him to appointments, buying groceries, helping with the meals, cleaning his house, and monitoring his finances and medications. When he went off his medication the prior September, he did really well until January 2011.

### (3). Trial court's findings

At the conclusion of the hearing on July 11, 2011, the People acknowledged that it was their burden to show that Ronald is mentally retarded and a danger to himself or others. They argued that the evidence established both elements. Defense counsel argued that Ronald is not dangerous to himself or others. Neither party argued that the People had to show, in accordance with Sweeney, that Ronald's mental retardation was a substantial cause of a serious difficulty in controlling dangerous behavior.

The court made oral findings. There were three salient facts: (1) it did not work out when Ronald went off his medication last fall; (2) it did not work out when Ronald was recently released home; and (3) while at BAP, Ronald had to be placed in restraints. The court then concluded, "[W]e've got three incidents here that show that his delusional situation and such is potentially a problem to himself and, arguably, to others; that they feel threatened, have to put him in restraints. One of the problems is that sometimes he does fine and other times he does not.

"Yeah, just walking across the street in the crosswalk happens all the time. But if someone is operating under the delusion that—if he walks out there at the wrong time, he may place himself in a potentially dangerous situation. Calling police and making certain statements, and when the police show up, acting in a certain fashion, I can see—as I said before—where the officer may perceive that he or she is in danger and has to act appropriately for their own safety.

"Again, there's enough here to show me that there is a real danger to himself or others, and rather than get to that point where we actually do have an unfortunate situation where some poor motorist strikes him in the crosswalk, or some police officer takes action he or she regrets later because they just didn't know the situation, I think it's appropriate, and I think the burden has been met for the petition to be granted."

The resulting written commitment order stated in part, "The Respondent is found, beyond a reasonable doubt, to be mentally retarded and a danger to himself or others."

### 3. The Statutory Scheme

At the time of these proceedings from May through July 2011, the relevant statutes provided: "On and after July 1, 1971, no mentally retarded person may be committed to the State Department of Developmental Services pursuant to this article, unless he or she is a danger to himself or herself, or others. . . .

"If the mentally retarded person is in the care or treatment of a state hospital, developmental center, or other facility at the time a petition for commitment is filed pursuant to this article, proof of a recent overt act while in the care and treatment of a state hospital, developmental center, or other facility is not required in order to find that the person is a danger to self or others.

"Any order of commitment made pursuant to this article shall expire automatically one year after the order of commitment is made. . . .

"In any proceedings conducted under the authority of this article, the alleged mentally retarded person shall be informed of his or her right to counsel by the court, and if the person does not have an attorney for the proceedings, the court shall immediately appoint the public defender or other attorney to represent him or her. . . . At any judicial proceeding under the provisions of this article, allegations that a person is mentally retarded and a danger to himself or herself or to others shall be presented by the district attorney for the county unless the board of supervisors, by ordinance or resolution, delegates this authority to the county counsel." (Former § 6500; · Stats. 1996, ch. 1076, § 5, pp. 7265–7266.)

 A number of persons and entities are authorized to request such a petition, including the director or designee of a "regional center." (Former

§ 6502, subd. (f); Stats. 1992, ch. 722, § 30, p. 3379.)[9] "The request shall state the petitioner's reasons for supposing the person to be eligible for admission thereto, and shall be verified by affidavit." (Former § 6502.)

A later section of the statutory scheme provides, "If the court finds that the person is mentally retarded, and that he or she is a danger to himself, herself, or to others, the court may make an order that the person be committed to the State Department of Developmental Services for suitable treatment and habilitation services." (Former § 6509, subd. (a); Stats. 1996, ch. 1076, § 8.5, p. 7268.)

■ In *Barrett*, the California Supreme Court summarized the statutory scheme as follows. "The basic rule is that 'no mentally retarded person may be committed . . .' to the Department 'unless he or she is a danger to himself or herself, or others.' (former § 6500.)" (*Barrett, supra*, 54 Cal.4th 1081, 1094.) "[A]llegations that a person is mentally retarded and dangerous are presented to the superior court in petition form by either the district attorney or county counsel, as determined by the county board of supervisors. (§ 6500; see § 6502.)" (*Id.* at p. 1095.) "The requisite findings of mental retardation and dangerousness allow the person to be 'committed to the [Department] for suitable treatment and habilitation services.' (§ 6509, subd. (a).)" (*Id.* at p. 1096.) "Whether the requisite findings of mental retardation and dangerousness are made by the court or a jury, the person is ordered committed to the Department for up to one year." (*Id.* at p. 1099.)

Notably, the statutes did not expressly require an allegation or a finding that mental retardation was a substantial cause of a serious difficulty in controlling dangerous behavior. They also did not require judicial advice about the right to a jury trial or personal waiver of that right.

### 4. THE LACK OF JUDICIAL ADVICE AND PERSONAL WAIVER OF JURY TRIAL

■ Relying on *People v. Alvas* (1990) 221 Cal.App.3d 1459 [271 Cal.Rptr. 131] (*Alvas*) and *Bailie, supra*, 144 Cal.App.4th 841, Ronald initially argued that he was deprived of his right to a jury trial as there is no record of either judicial advice or waiver of this right. The California Supreme Court has recently disapproved of *Alvas* and *Bailie* in concluding that neither due process nor equal protection requires judicial advice or personal waiver of the right to a jury trial by a person alleged to be mentally

---

[9] Regional centers in this context are community-based nonprofit agencies funded and regulated by the state to serve developmentally disabled persons pursuant to the Lanterman Developmental Disabilities Services (LDDS) Act (§ 4500 et seq.). (*Barrett, supra*, 54 Cal.4th 1081, 1090, 1094, fns. 3, 10.)

retarded. (*Barrett, supra,* 54 Cal.4th 1081, 1105–1106, 1109.) Ronald has conceded that these opinions were overruled by *Barrett* after his reply brief was filed. We accept this concession. *Barrett* compels the conclusion that there was no constitutional violation in the trial court neither advising Ronald about his right to a jury trial nor obtaining his personal waiver of that right. Further, in the absence of a recorded request for a jury trial, the right was implicitly waived by Ronald's counsel.

### 5. THE NEED FOR EVIDENCE THAT RONALD'S RETARDATION CAUSES A DANGEROUS LACK OF SELF-CONTROL

As explained in part 3., above, former section 6500 expressly required only two findings to justify a commitment: (1) proof that the person is mentally retarded, and (2) proof that the person is "a danger to himself or herself, or others." At trial, it was undisputed that Ronald was mentally retarded. Thus, the parties focused on the evidence of Ronald's dangerousness. Below, neither party argued that the trial court had to find a causal link between Ronald's mental retardation and his dangerousness.

On appeal, Ronald contends that a section 6500 commitment requires a causal link between his mental retardation and his dangerousness in order to comply with due process. Specifically, as prior cases have held, Ronald argues that there must be proof that the person's "mental retardation is a substantial factor in causing him [or her] serious difficulty in controlling his [or her] dangerous behavior." (*Sweeney, supra,* 175 Cal.App.4th at p. 223; see *In re O.P.* (2012) 207 Cal.App.4th 924, 931 [143 Cal.Rptr.3d 869]; *Bailie, supra,* 144 Cal.App.4th at p. 847 [commitment under former § 6500 requires proof that the person's "mental retardation causes him or her to have serious difficulty in controlling dangerous behavior"].)

One of the first cases to consider this issue was *People v. Quinn* (2001) 86 Cal.App.4th 1290 [103 Cal.Rptr.2d 915] (*Quinn*), which noted that section 6500 does not contain an express "requirement that the dangerous condition be caused by mental retardation." (86 Cal.App.4th at p. 1293.) The *Quinn* court declined to read such a requirement into the statute: " '[S]ection 6500 singles out the mentally retarded . . . and permits their involuntary confinement . . . upon proof of mental retardation and dangerousness to self or others . . . .' [Citation.] The causation Quinn seeks to add is not the language of the statute." (*Id.* at pp. 1293–1294.)

A few years later, the California Supreme Court issued its opinion in *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), where it considered the constitutionality of former section 1800 et seq., a statutory scheme that allowed the civil commitment of juvenile

offenders who would otherwise be discharged by statute from a Youth Authority commitment. The *Howard N.* court determined that the extended detention scheme violated due process because it did not expressly require a finding "that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling behavior." (35 Cal.4th at p. 122, fn. omitted.) In that case, the Attorney General conceded and the Supreme Court agreed "that to be constitutional, the extended detention scheme must contain a requirement of serious difficulty in controlling dangerous behavior, in order to distinguish those persons who are subject to civil commitment from those persons more properly dealt with by the criminal law." (*Id.* at p. 132.)

The following year, 2006, in *Bailie*, the Third District Court of Appeal found that the rationale of *Quinn* had been undermined by *Howard N.* (*Bailie, supra*, 144 Cal.App.4th at p. 850.) The *Bailie* court considered whether a section 6500 commitment requires a causal link between the person's mental retardation and dangerousness. In dictum, the *Bailie* court construed the section 6500 scheme as including a requirement that the person's mental retardation causes "serious difficulty in controlling dangerous behavior." (144 Cal.App.4th at p. 850.)[10]

In 2009, Division Two of the Fourth Appellate District confirmed the *Bailie* dictum in *Sweeney, supra*, 175 Cal.App.4th 210. In *Sweeney*, the issue arose in the context of an instructional error claim. The instructions had "informed the jury that it must find Sweeney had difficulty controlling her dangerous behavior," but not that Sweeney's "mental disorder was the cause of [her] dangerous behavior." (*Sweeney, supra*, 175 Cal.App.4th at p. 225.) The court concluded that, in accordance with due process, the trial court should have instructed the jury that, "in order to find Sweeney met the criteria of section 6500, it must [find] Sweeney's mental retardation [i]s a substantial factor in causing her serious difficulty in controlling her dangerous behavior." (*Ibid.*)

■ In this case, the Attorney General agrees with Ronald that a section 6500 commitment requires proof that the person's "mental retardation is a substantial factor in causing him [or her] serious difficulty in controlling his [or her] dangerous behavior." (*Sweeney, supra*, 175 Cal.App.4th at p. 223.) However, the parties dispute whether or not there was substantial evidence to support such a finding.

In conducting a substantial evidence review, "the appellate court 'must view the evidence in a light most favorable to respondent and presume in

---

[10] Recently, in *Barrett, supra*, 54 Cal.4th at page 1109, the California Supreme Court disapproved *Bailie* to the extent that it held that a person subject to commitment under section 6500 has the right to a jury trial. The parties agree that nothing in *Barrett* undermined *Bailie*'s determination that section 6500 should be construed as including a requirement that the person's mental retardation causes serious difficulty in controlling dangerous behavior.

support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citations.]" (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577 [162 Cal.Rptr. 431, 606 P.2d 738].) To be substantial, the evidence must be " 'of ponderable legal significance . . . reasonable in nature, credible and of solid value.' " (*Id.* at p. 576.) The issue must be resolved in light of the entire record. (*Id.* at p. 577.)

Ronald contends there was no substantial evidence to support a finding that his "mental retardation [was] a substantial factor in causing him serious difficulty in controlling his dangerous behavior." (*Sweeney, supra*, 175 Cal.App.4th at p. 223.) He points out that he has a dual diagnosis of mental retardation and paranoid psychosis, and that the evidence suggested he became delusional—and thus dangerous—when he stopped taking antipsychotic medication. In other words, Ronald contends that the evidence showed a causal link between his dangerousness and his mental illness, but no causal link between his dangerousness and his mental retardation.

The Attorney General acknowledges that neither Dr. Walker nor Ronald's caseworker "explicitly stated that [Ronald's] mental retardation was a substantial cause or factor in his dangerous lack of self control," but contends that the evidence nevertheless supports such a finding. The Attorney General recites some of the facts indicating that Ronald was dangerous to himself or others, points out that Ronald was delusional even when taking antipsychotic medication, and notes that he had demonstrated an inability to take his medication regularly. The Attorney General also notes that Dr. Walker believed Ronald needed to be in a locked psychiatric facility and that her report indicated that Ronald's "Mild Intellectual Disability . . . contributes to the manifestation of" some of his behaviors.

Based on our review of the entire record, we find no substantial evidence to support a finding that Ronald's "mental retardation [was] a substantial factor in causing him serious difficulty in controlling his dangerous behavior." (*Sweeney, supra*, 175 Cal.App.4th at p. 223.) Dr. Walker was not asked this question at trial and did not address the issue in her testimony or her report. Nothing in the report prepared by Ronald's caseworker, Vasantha Siddappa, directly addressed this question. Even more importantly, the evidence introduced at trial strongly suggested that Ronald's dangerous behavior was attributable almost entirely to his mental illness (i.e., psychosis), and not his mental retardation.

For instance, Siddappa's report states that prior to 1992, Ronald showed no signs of mental illness. Siddappa's report reflects that on August 23, 1992, Ronald had a violent outburst, which "was the beginning of his psychiatric history and medication changes." That report reflects that Ronald had not

previously engaged in any violence despite having a history of "mild delay" and a diagnosis of mental retardation in 1988. The report further reflects that Ronald's noncompliance with psychotropic medications "is common among those suffering from psychosis." This evidence points to a clear connection between Ronald's dangerousness and his psychosis, but not to any connection between his dangerousness and his mental retardation.

Siddappa's report reflects that from 1999 to 2011, Ronald was prescribed a variety of antipsychotic medications to treat his delusions, paranoia, and agitation. The medications included Zyprexa, Abilify, Risperdal, and Xanax. The report reflects that Ronald's paranoid delusions caused him to be dangerous to himself and others, and that "[w]ithout medication for his mental illness, behaviors are out of control." Again, this evidence points to a clear connection between Ronald's dangerousness and his psychosis, but not to any connection between his dangerousness and his mental retardation.

Dr. Walker's report likewise reflects that Ronald's psychotropic medications were prescribed for his "target behaviors." Although her report indicates that his diagnosis of mild intellectual disability "contributes to the manifestation of" the target behaviors, this is the only indication of any causal link between Ronald's dangerousness and his mental retardation. We find this comment insufficient to support a finding that Ronald's "mental retardation [was] a substantial factor in causing him serious difficulty in controlling his dangerous behavior." (*Sweeney, supra,* 175 Cal.App.4th at p. 223; see *People v. Johnson, supra,* 26 Cal.3d at p. 577 [appellate court may not limit its "appraisal to isolated bits of evidence selected by the respondent"].) As noted, the reports otherwise indicate that Ronald's dangerousness was caused by his mental illness, not his mental retardation.[11] Further, at trial, Dr. Walker testified that Ronald's dangerousness was attributable to his "delusional ideation."

In sum, on this record, we find that there is no substantial evidence to support a finding that Ronald's "mental retardation [was] a substantial factor in causing him serious difficulty in controlling his dangerous behavior." (*Sweeney, supra,* 175 Cal.App.4th at p. 223.)[12] Therefore, Ronald should not have been committed under section 6500.

---

[11] We express no opinion on whether a commitment might have been justified under the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.).

[12] In light of this conclusion, we need not reach Ronald's contentions that *Bailie* and *Sweeney* required the petition to allege and the trial court to find a causal connection between Ronald's dangerousness and his mental retardation.

## 6. Disposition

The commitment order is reversed.

Elia, Acting P. J., and Bamattre-Manoukian, J., concurred.

**MÁRQUEZ, J.,**—Concurring. As noted in the majority opinion, *People v. Sweeney* (2009) 175 Cal.App.4th 210 [95 Cal.Rptr.3d 557] (*Sweeney*) requires—in addition to the statutory requirements "that the person is mentally retarded, and that he or she is a danger to himself, herself, or to others" (Welf. & Inst. Code, former § 6509; Stats. 1996, ch. 1076, § 8.5, p. 7268.)[1]—that mental retardation is a substantial factor in causing serious difficulty in controlling dangerous behavior. (*Sweeney, supra,* at p. 225.) But my review of what *Sweeney* and *People v. Bailie* (2006) 144 Cal.App.4th 841 [50 Cal.Rptr.3d 761] (*Bailie*) cite as precedent for this additional requirement compels me to write separately to identify a problem not raised by the parties in this case: that *Bailie* and *Sweeney* represent an unwarranted judicial extension to the mentally retarded of decisions by the Supreme Courts of California and the United States primarily involving sexually violent predators (SVPs) and former juvenile offenders who continue to be dangerous.

I will explain below that neither substantive nor procedural due process compels as a condition precedent to a section 6500 civil commitment that a person manifests a dangerous lack of self-control that results from that person's mental retardation.[2] As noted in *People v. Barrett* (2012) 54 Cal.4th 1081 [144 Cal.Rptr.3d 661, 281 P.3d 753] (*Barrett*), there are four different degrees of mental retardation, from mild to profound, and "the vast majority of persons who are mentally retarded are classified as mildly retarded [citation], although it is unclear what proportion of individuals facing commitment under section 6500 are mildly retarded." (*Id.* at pp. 1130–1131 (conc. & dis. opn. of Liu, J.).) Given the broad array of persons classified as mentally retarded, I do not believe it is appropriate, nor do I believe that the Constitution requires, that a mentally retarded person lack impulse control—

---

[1] Unspecified section references in this concurring opinion are to the Welfare and Institutions Code.

[2] "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law.*" (*Zinermon v. Burch* (1990) 494 U.S. 113, 125 [108 L.Ed.2d 100, 110 S.Ct. 975].) In contrast, substantive due process is not concerned with the procedure involved (cf. *Washington v. Harper* (1990) 494 U.S. 210, 220 [108 L.Ed.2d 178, 110 S.Ct. 1028]), but with more fundamental questions, namely, does the asserted right qualify for constitutional protection as an aspect of life, liberty, or property (cf. *Youngberg v. Romeo* (1982) 457 U.S. 307, 317–319 [73 L.Ed.2d 28, 102 S.Ct. 2452]), and under what circumstances is governmental deprivation justified. (Cf. *id.* at pp. 319–321; *Zinermon v. Burch, supra,* 494 U.S. at p. 125.)

akin to an SVP or a dangerous juvenile offender—before that person may be committed pursuant to section 6500 to receive "the custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community." (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137 [151 Cal.Rptr. 653, 588 P.2d 793].) Instead, the substantive threshold for a commitment under section 6500 should require, at a minimum, that there be an articulable nexus between an individual's mental retardation and dangerousness, but such dangerousness need not involve a lack of self-control. To meet this threshold, a qualified expert could offer a specific and credible explanation of how an individual's mental retardation makes him or her a danger to self or others, even if the individual does not suffer from a lack of self-control.

As yet, the Legislature has not incorporated the holding of *Sweeney* into the statutory scheme for the civil commitment of the mentally retarded. I urge the Legislature to consider an amendment imposing a statutorily defined causal link between mental retardation and dangerousness such as the articulable nexus test described above that would, in my view, be more appropriate for the broad array of persons classified as mentally retarded.

### 1. THE UNITED STATES SUPREME COURT

As described more fully below, the substantive due process holdings of the United States Supreme Court have not attempted to articulate the sine qua non for all civil commitments. For this reason, in my view, the dictum in *Bailey* and the holding in *Sweeney* are not compelled by United States Supreme Court authority. Instead, the high court has proceeded cautiously in this area and pointed out what is and is not enough to satisfy substantive due process for different kinds of civil commitments without attempting to state a bright-line test for all such commitments.

In *O'Connor v. Donaldson* (1975) 422 U.S. 563 [45 L.Ed.2d 396, 95 S.Ct. 2486] (*O'Connor*), for example, the court confronted the limited question whether substantive due process allowed for involuntary confinement on the basis of mental illness alone. The court concluded: "A finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that that term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and can live safely in freedom." (*Id.* at p. 575.) "[A] State cannot constitutionally confine without more a nondangerous individual who is capable of surviving safely in freedom by himself or with the help of willing and responsible family members or friends." (*Id.* at p. 576.)

In *Foucha v. Louisiana* (1992) 504 U.S. 71 [118 L.Ed.2d 437, 112 S.Ct. 1780] (*Foucha*), the court considered the other side of the *O'Connor* coin—a statute that authorized continued civil commitment based on current dangerousness of a person who had previously been determined to be not guilty by reason of insanity, whether or not the person remained mentally ill. (*Id.* at p. 73.) The court stated: "*Addington* v. *Texas*, 441 U.S. 418 [60 L.Ed.2d 323, 99 S.Ct. 1804] (1979), held that to commit an individual to a mental institution in a civil proceeding, the State is required by the Due Process Clause to prove by clear and convincing evidence the two statutory preconditions to commitment: that the person sought to be committed is mentally ill and that he requires hospitalization for his own welfare and protection of others." (*Id.* at pp. 75–76.) "[K]eeping Foucha against his will in a mental institution is improper absent a determination in civil commitment proceedings of current mental illness and dangerousness." (*Id.* at p. 78.)

Considered together, *O'Connor* and *Foucha* establish that a civil commitment cannot be based on either mental illness or dangerousness alone. Some combination of those factors is required. Those decisions did not go further to describe what kind of connection is required between those factors, but neither case held that the dangerousness must result from, or be caused by, the mental condition.

The connection between dangerousness and a mental condition was subsequently discussed by the United States Supreme Court in two cases arising from a Kansas statute which provided for the civil commitment of those it classified as SVPs. In *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*), the Supreme Court of Kansas had determined as a matter of substantive due process that a person could not be civilly committed under that state's SVP Act for " 'mental abnormality,' " because United States Supreme Court precedent, such as *Foucha*, required a civil commitment to be based on evidence of " 'mental illness.' " (521 U.S. at p. 356.)[3] The court upheld the Kansas statute, concluding that "the Act's definition of 'mental abnormality' satisfies 'substantive' due process requirements." (521 U.S. at p. 356.)

To support this conclusion, the court reviewed its precedent in the following passages. "A finding of dangerousness, standing alone, is ordinarily not a sufficient ground upon which to justify indefinite involuntary commitment.

---

[3] The Kansas statute defined " 'sexually violent predator' " as a person previously convicted of or charged with a sexually violent offense and " 'who suffers from a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence' " and defined " 'mental abnormality' " as a " 'condition affecting the emotional or volitional capacity which predisposes the person to commit sexually violent offenses in a degree constituting such person a menace to the health and safety of others.' " (*Hendricks, supra,* 521 U.S. 346, 352.)

We have sustained civil commitment statutes when they have coupled proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' [Citations.] These added statutory requirements serve to limit involuntary civil confinement to those who suffer from a volitional impairment rendering them dangerous beyond their control. The Kansas Act is plainly of a kind with these other civil commitment statutes: It requires a finding of future dangerousness, and then links that finding to the existence of a 'mental abnormality' or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior. [Citing the Kansas statute.] The precommitment requirement of a 'mental abnormality' or 'personality disorder' is consistent with the requirements of these other statutes that we have upheld in that it narrows the class of persons eligible for confinement to those who are unable to control their dangerousness." (*Hendricks, supra,* 521 U.S. 346, 358.)

"To the extent that the civil commitment statutes we have considered set forth criteria relating to an individual's inability to control his dangerousness, the Kansas Act sets forth comparable criteria and Hendricks' condition doubtless satisfies those criteria. . . . [His] admitted lack of volitional control, coupled with a prediction of future dangerousness, adequately distinguishes Hendricks from other dangerous persons who are perhaps more properly dealt with exclusively through criminal proceedings." (*Hendricks, supra,* 521 U.S. 346, 360.)

*Hendricks* rejected the appellant's contention that *Foucha* made mental illness a prerequisite for a civil commitment, stating that the phrase "mental illness" had no "talismanic significance," considering that psychiatrists frequently disagreed about its parameters. (*Hendricks, supra,* 521 U.S. at p. 359.) "[W]e have never required state legislatures to adopt any particular nomenclature in drafting civil commitment statutes. Rather, we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance." (*Ibid.*)

Five years later, in *Kansas v. Crane* (2002) 534 U.S. 407 [151 L.Ed.2d 856, 122 S.Ct. 867] (*Crane*), the court clarified its decision in *Hendricks*. It reviewed a decision by the Kansas Supreme Court that interpreted *Hendricks* as requiring a finding prior to civil commitment that an SVP be completely unable to control his or her behavior. (*Id.* at p. 411.) The court rejected that interpretation and vacated the Kansas Supreme Court's judgment. (*Id.* at p. 415.) It said, "We agree with Kansas insofar as it argues that *Hendricks* set forth no requirement of *total* or *complete* lack of control. *Hendricks* referred to the Kansas Act as requiring a 'mental abnormality' or 'personality disorder' that makes it '*difficult,* if not impossible, for the [dangerous] person to control his dangerous behavior.' 521 U.S., at 358 (emphasis added)." (*Crane,*

*supra*, 534 U.S. at p. 411.) "We do not agree with the State, however, insofar as it seeks to claim that the Constitution permits commitment of the type of dangerous sexual offender considered in *Hendricks* without *any* lack-of-control determination." (*Id.* at p. 412.) "[W]e recognize that in cases where lack of control is at issue, 'inability to control behavior' will not be demonstrable with mathematical precision. It is enough to say that there must be proof of serious difficulty in controlling behavior." (*Id.* at p. 413.)

There are several indications in *Hendricks* and *Crane* that those decisions were not intended to identify the minimum requirements of substantive due process for all civil commitments.

The Kansas statute in *Hendricks* defined a committable mental abnormality as affecting either a person's "emotional or volitional capacity" in a specified way. (*Hendricks, supra*, 521 U.S. 346, 352.) *Crane* noted that *Hendricks* "limited its discussion to volitional disabilities" and did not address that part of the Kansas statute that authorizes civil commitment for an emotional impairment that does not affect volition. (*Crane, supra*, 534 U.S. 407, 414.) *Crane* explained that Leroy Hendricks suffered from "pedophilia—a mental abnormality that critically involves what a lay person might describe as a lack of control." (*Ibid.*) "[C]ivil commitment *of dangerous sexual offenders* will normally involve individuals who find it particularly difficult to control their behavior—in the general sense described above." (*Ibid.*, italics added.)

*Crane* further observed that *Hendricks* made no clear distinction between emotional and volitional impairments. "[A]s in other areas of psychiatry, there may be 'considerable overlap between a . . . defective understanding or appreciation and . . . [an] ability to control . . . behavior,' " and the United States Supreme Court has not ordinarily distinguished "for constitutional purposes among volitional, emotional, and cognitive impairments." (*Crane, supra*, 534 U.S. 407, 415.) As the court in *Hendricks* "had no occasion to consider whether confinement based solely on 'emotional' abnormality would be constitutional," *Crane* did not reach that issue either. (*Ibid.*) Thus, neither *Hendricks* nor *Crane* invalidated the part of the Kansas statute that addressed emotional impairments. More importantly, they did not consider cognitive impairments.

There is language in *Hendricks* that appears to suggest what kind of connection must be made between an individual's mental condition and dangerousness to satisfy the requirements of substantive due process. The court described itself as upholding other statutes "when they have *coupled* proof of dangerousness with the proof of some additional factor, such as a 'mental illness' or 'mental abnormality.' " (*Hendricks, supra*, 521 U.S. 346, 358, italics added.) The Kansas statute required "a finding of future danger-ousness, and then *links* that finding to the existence of a 'mental abnormality'

or 'personality disorder' that makes it difficult, if not impossible, for the person to control his dangerous behavior." (521 U.S. at p. 358, italics added.)

The Kansas statute at issue did not merely couple or link proof of dangerousness with proof of a mental condition. Instead, the statute included *the person's dangerousness within its definition of the kind of mental condition justifying a civil commitment.* As quoted above, the condition justifying commitment under that statute is a mental abnormality or personality disorder with the singular aspect of an inclination to commit violent sex offenses. In light of this statutory language, proof that a person has the statutorily defined mental condition also proves that he or she is dangerous. Because the very existence of the mental condition is what makes the person dangerous under the Kansas statute, it was unnecessary for the United States Supreme Court in *Hendricks* or *Crane* to decide whether a more attenuated connection between a person's mental condition and dangerousness would also satisfy due process.

In *Hendricks*, the court concluded that the Kansas statute satisfied substantive due process in defining the circumstances justifying the civil commitment of an SVP, namely a dangerous lack of control over an inclination to commit sexually violent offenses. But in finding that the Kansas statute had surpassed the threshold, the court did not identify that formulation as the sine qua non for all civil commitments.

## 2. THE CALIFORNIA SUPREME COURT

The California Supreme Court has extended the holdings of *Hendricks* and *Crane* to another kind of civil commitment not involving SVPs— commitments of former juvenile offenders who continue to be dangerous. But in doing so, the court has not held that a dangerous lack of self-control is the minimum requirement of substantive due process for all civil commitments.

*Hendricks* and *Crane* initially guided the California Supreme Court in evaluating challenges to California's own SVP statutes (§ 6600 et seq.), which authorize the civil commitment of sexually violent predators.[4] In *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138 [81 Cal.Rptr.2d 492, 969

---

[4] Section 6600 provides: " 'Sexually violent predator' means a person who has been convicted of a sexually violent offense against one or more victims and who has a diagnosed mental disorder that makes the person a danger to the health and safety of others in that it is likely that he or she will engage in sexually violent criminal behavior." (§ 6600, subd. (a)(1).) " 'Diagnosed mental disorder' includes a congenital or acquired condition affecting the emotional or volitional capacity that predisposes the person to the commission of criminal sexual acts in a degree constituting the person a menace to the health and safety of others." (§ 6600, subd. (c).)

P.2d 584] (*Hubbart*), which was decided before *Crane*, the court rejected challenges to California's SVP Act on several grounds, including substantive due process. The court essentially concluded that California's statute was sufficiently similar to the Kansas statute upheld in *Hendricks*. (19 Cal.4th at p. 1157.)

In *People v. Williams* (2003) 31 Cal.4th 757 [3 Cal.Rptr.3d 684, 74 P.3d 779] (*Williams*), the court confronted a question of procedural due process: whether a jury in an SVP proceeding after *Crane* must be instructed to find that the person has serious difficulty in controlling his or her behavior. (*Id.* at pp. 779–780.) *Williams* concluded that "*Kansas v. Crane, supra,* 534 U.S. 407, does not compel us to hold that further lack-of-control instructions or findings are necessary to support a commitment under the SVPA." (*Id.* at pp. 774–775.) The court reasoned that *Hendricks* and *Hubbart* both recognized that "states have considerable leeway in describing and defining the necessary link between a control-impairing disorder and a prediction of future dangerousness . . . ." (*Id.* at p. 769.) Each opinion found the statutory language adequate without reading new elements or requirements into the statutory scheme. (*Id.* at pp. 768–769.)[5]

Then, in 2005, in *In re Howard N.* (2005) 35 Cal.4th 117 [24 Cal.Rptr.3d 866, 106 P.3d 305] (*Howard N.*), the court considered the application of *Hendricks* and *Crane* to extended civil commitments of former juvenile offenders who continue to be dangerous. At issue in *Howard N.* was a question of procedural due process, whether the Extended Detention Act (former § 1800 et seq.) "violates due process because it does not expressly require a finding that the person's mental deficiency, disorder, or abnormality causes serious difficulty in controlling behavior." (*Howard N., supra,* 35 Cal.4th 117, 122, fn. omitted.) That statute authorized extending the commitment of former juvenile offenders otherwise subject to discharge from the custody of the former Youth Authority (now Division of Juvenile Facilities) if the fact finder affirmatively answered "the following statutory question: 'Is the person physically dangerous to the public because of his or her mental or physical deficiency, disorder, or abnormality?' (§ 1801.5.)" (*Id.* at p. 126, fn. omitted.).

In *Howard N.*, the court noted that "[a] recent series of cases both in the United State Supreme Court and in this court has clarified that to be involuntarily civilly committed as a sexually violent predator, the person must, as a result of mental illness, have serious difficulty controlling his dangerous behavior. (*Kansas v. Crane*[, *supra,*] 534 U.S. 407, 412–413 . . . ;

---

[5] The majority view of SVP acts in other jurisdictions is that no jury instruction on the lack of self-control is required. (*Richard S. v. Carpinello* (2nd Cir. 2009) 589 F.3d 75, 83–84, and cases there cited.)

*Hendricks, supra,* 521 U.S. at pp. 358, 360; *People v. Williams*[, *supra,*] 31 Cal.4th 757, 759, 772, 774 . . . ; *Hubbart, supra,* 19 Cal.4th at pp. 1156, 1158.)" (*Howard N., supra,* 35 Cal.4th at p. 128.) Recognizing that *Hendricks* and *Crane* involved an SVP statute, the court observed that "nothing in the language of these high court cases indicates that the lack of control requirement is limited to the sexually violent predator context. Indeed, it is difficult to imagine on what basis the high court could articulate different due process standards for the civil commitment of dangerous mentally ill persons who happen to be sexually violent predators than for those dangerous mentally ill persons who are not sexually violent predators. Thus, while the high court performed its due process analysis in the sexually violent predator context, its constitutional pronouncements are instructive here" (*id.* at p. 131), where the court was considering the extended civil commitment of a former juvenile offender who continued to be dangerous.

Perhaps in view of that precedent, the Attorney General conceded in *Howard N.* "that to be constitutional, the extended detention scheme [for former juvenile offenders] must contain a requirement of serious difficulty in controlling dangerous behavior, in order to distinguish those persons who are subject to civil commitment from those persons more properly dealt with by the criminal law." (*Howard N., supra,* 35 Cal.4th 117, 132.) The court agreed and held that procedural due process requires an express finding of a dangerous lack of self-control to justify extending a former juvenile offender's commitment under section 1800. (35 Cal.4th at pp. 122, 132–133.) The court also held that this requirement should be read into the statute. (*Id.* at p. 135.) Further, in a dictum, the court said that "[t]his aspect of the person's condition must be alleged in the petition for extended commitment (§ 1800), and demonstrated at the probable cause hearing (§ 1801) and any ensuing trial (§ 1801.5)." (*Ibid.*)[6]

Though *Williams* had earlier concluded that no explicit finding of a dangerous lack of self-control was necessary to justify the civil commitment of an SVP, *Howard N.* concluded that there must be such an explicit finding to justify extending the commitment of a former juvenile offender who continues to be dangerous under former section 1800.

Two years after *Howard N.,* the court gave further consideration to what is constitutionally required to justify extending the commitments of former juvenile offenders who continue to be dangerous. In *In re Lemanuel C.* (2007) 41 Cal.4th 33 [58 Cal.Rptr.3d 597, 158 P.3d 148] (*Lemanuel C.*), it considered "defendant's claim that his civil commitment under section 1800 is

---

[6] The Legislature promptly amended Section 1800 following the *Howard N.* decision in February 2005 to expressly add the language implied by *Howard N.* (Stats. 2005, ch. 110, § 1, p. 1884; eff. July 21, 2005.)

unconstitutional because the petition did not allege, and the trial court did not specifically find, 'a serious and well-founded risk' that he 'would reoffend' if not committed." (*Id.* at pp. 37–38.) In rejecting this claim, which was based on both due process and equal protection grounds, the court explained that "the 'serious and well-founded risk of reoffense' language found in some SVP cases and reflected in CALCRIM No. 3454 simply explains the 'likely to engage in sexually violent predatory criminal behavior' component of the future *dangerousness* finding required for an SVP commitment." (*Id.* at p. 46.) "[D]ue process is satisfied because section 1800 requires a finding of a mental disorder resulting in dangerousness, and it properly links that finding to a second required finding that the mental disorder causes the inability to control dangerous behavior." (*Id.* at p. 45.)

With respect to equal protection, the court determined that dangerous juvenile offenders are not similarly situated with SVPs or mentally disordered offenders (MDOs). "The fact that Youth Authority wards committed under section 1800 and adults committed as SVP's or MDO's are considered dangerous due to mental disorders and therefore are subject to commitment for treatment and the protection of the public does not lead to the conclusion that 'persons committed under California's various civil commitment statutes are similarly situated in all respects. They are not.' [Citation.] Although section 1800 is a civil commitment statute, as are the SVPA and the MDOA, the Legislature enacted the adult civil commitment statutes with different purposes in mind than the purpose of the section 1800 extended detention scheme challenged here." (*Lemanuel C., supra,* 41 Cal.4th 33, 48.)

More recently, the court in *Barrett, supra,* 54 Cal.4th 1081 determined that procedural due process does not require either judicial advice to the mentally retarded about their right to a jury trial or a personal waiver of that right, even though such a right is statutorily conferred by section 5302, part of the Lanterman-Petris-Short (LPS) Act (§ 5000 et seq.), on a person who is "gravely disabled" due to a mental illness. *Barrett* also explained why the mentally retarded are not similarly situated with potential LPS Act committees. The court reasoned that, on the one hand, mental illness and related disorders do not necessarily preclude a person from functioning in a competent manner. "By contrast, in the case of persons alleged to be mentally retarded and dangerous under section 6500, the commitment process itself raises substantial doubts about their cognitive and intellectual functioning sufficient to limit the personal and procedural role they play. It follows that the two groups are not similarly situated as to the function that . . . an advisement like section 5302 serves—comprehending and controlling the decision whether to request a jury trial." (*Barrett, supra,* 54 Cal.4th 1081, 1109.)

In summary, though the court in *Howard N.* did not distinguish dangerous juvenile offenders from SVPs for purposes of requiring a finding of a dangerous lack of self-control (*Howard N., supra*, 35 Cal.4th 117, 128), two years later the court articulated significant differences between such offenders in *Lemanuel C.* (*Lemanuel C., supra*, 41 Cal.4th 33, 48.) And in 2012, the court articulated differences between the mentally retarded and those subject to LPS Act commitments and determined that procedural due process does not require the same kinds of judicial advice about the right to jury trial.

### 3. THE RELEVANCE OF A DANGEROUS LACK OF SELF-CONTROL

A sexually violent predator, by statutory definition, poses a danger to others because not only does he have a mental condition or disorder that predisposes him to commit violent sex crimes, he has already acted on that inclination. A serious difficulty in controlling such an impulse, in other words, a dangerous lack of self-control, is the very essence of the committable condition, as it is that lack of self-control that makes the predator dangerous. For substantive due process to require a showing of dangerous lack of self-control ensures "that the nature of [the] commitment bear[s] some reasonable relation to the purpose for which the individual is committed." (*Foucha, supra,* 504 U.S. 71, 79.)

There are a number of other kinds of civil commitments: "Most of California's civil commitment statutes apply to persons who have been accused or convicted of a crime. (See §§ 1800 et seq. [mentally disordered offenders discharged by juvenile authorities], 3000 et seq. [narcotics addicts], 6600 et seq. [sexually violent predators]; Pen. Code, §§ 1026–1027 [defendants acquitted by reason of insanity]; Pen. Code, § 1367 [defendants found mentally incompetent]; Pen. Code, § 2960 et seq. [mentally disordered offenders].) Only two involuntary commitment schemes—the Lanterman-Petris-Short Act (§ 5300 et seq.) and section 6500—authorize the state to assert prolonged custody over individuals through proceedings completely separate from the juvenile and criminal justice systems. Section 5300 authorizes the commitment of certain mentally ill persons for 180 days upon a finding of dangerousness. Section 6500 authorizes a renewable one-year commitment for persons found to be mentally retarded and dangerous. Neither statute requires the state to show or charge criminal conduct." (*Barrett, supra,* 54 Cal.4th 1081, 1118 (conc. & dis. opn. of Liu, J.).)

The California Supreme Court has previously observed that a commitment proceeding under section 6500 "is not initiated in response, or necessarily related, to any criminal acts; it is of limited duration, expiring at the end of one year and any new petition is subject to the same procedures as an original commitment . . . . The sole state interest, legislatively expressed, is the

custodial care, diagnosis, treatment, and protection of persons who are unable to take care of themselves and who for their own well being and the safety of others cannot be left adrift in the community." (*Cramer v. Tyars, supra,* 23 Cal.3d 131, 137.) The California Supreme Court found these observations equally true of conservatorship proceedings under the LPS Act. (*Conservatorship of Susan T.* (1994) 8 Cal.4th 1005, 1015 [36 Cal.Rptr.2d 40, 884 P.2d 988].)

In addition to the prior criminality that is prerequisite to other kinds of commitment proceedings, the LPS Act and former section 6500 are distinguishable from other civil commitment schemes for another important reason. As noted above, statutes authorizing civil commitment of sexually violent predators are concerned solely with potential danger to the public, not to the predator.[7] Protecting the public is the objective of the SVP Act. (*In re Smith* (2008) 42 Cal.4th 1251, 1262 [73 Cal.Rptr.3d 469, 178 P.3d 446].) This is also a focus of some other civil commitment statutes. (E.g., § 1800 [extended commitment of Youth Authority inmate "physically dangerous to the public"]; former § 6300 [a " 'mentally disordered sex offender' " (MDSO) is "dangerous to the health and safety of others"]; former § 6316.2 [extended commitment of MDSO who "presents a substantial danger of bodily harm to others"].)

Proceedings for the commitment of the mentally retarded under section 6500 or for the commitment of the mentally ill under the LPS Act, on the other hand, are not solely concerned with protecting the public. To be sure, danger to others remains a consideration under those statutes (e.g., §§ 6506, 5304), but an equally important objective is to offer protection to those who are a danger to themselves. (§ 5150; former § 6509.)

When an underlying objective of a statutory scheme is to allow the government to protect persons with a mental or physical disability who are a danger to themselves, requiring evidence of a dangerous lack of self-control operates to exclude those individuals from the protections the Legislature sought to grant them. In other words, the inability to control an impulse to commit a violent sexual offense may provide a constitutional justification for a civil commitment of a person as an SVP. But a lack of self-control is an inapt test for determining what makes a person's mental retardation a

---

[7] In one passage, *Hendricks* stated, "The challenged Act unambiguously requires a finding of dangerousness either to one's self or to others as a prerequisite to involuntary confinement." (*Hendricks, supra,* 521 U.S. 346, 357.) But the kind of dangerousness described in the statute was " 'a mental abnormality or personality disorder which makes the person likely to engage in the predatory acts of sexual violence.' " (*Ibid.,* quoting the Kansas statute.) Thus, the statute's sole concern was a person's likely commission of sexual offenses against others, not self-endangerment.

condition that justifies an involuntary civil commitment for the protection of one's self. The facts of this case illustrate this point.

Ronald's dangerous behaviors—endangering himself by walking into traffic while raising his hands, calling the police with burglary reports and endangering others by leaving his medications on his neighbor's doorstep— were explained as resulting from paranoia and delusions. Delusions may precipitate all kinds of self-endangering behavior. But it makes little sense to require a fact finder to determine whether Ronald's delusions involve a dangerous lack of self-control. Is a delusional person expected to exercise self-control in not acting on delusions or in not having them in the first place? While lack of self-control may be an essential element of some mental conditions that place the public in danger due to prior or attendant criminal conduct, it appears irrelevant to others.

In the LPS context, the Third District Court of Appeal has recognized the limitations of the lack of self-control test. In *Conservatorship of Carol K.* (2010) 188 Cal.App.4th 123 [115 Cal.Rptr.3d 343] (*Carol K.*), the court stated: "Here, we consider whether Carol is gravely disabled under the LPS Act, not whether Carol was dangerous to the public. The LPS Act and the Sexually Violent Predators Act (Welf. & Inst. Code, § 6600 et seq.) are different statutory schemes with different purposes and provisions. The Sexually Violent Predators Act scheme provides greater procedural safeguards. (*Cooley v. Superior Court* (2002) 29 Cal.4th 228, 253–254 [127 Cal.Rptr.2d 177, 57 P.3d 654].) The requirements imposed under *Howard N.* are directed at the involuntary civil commitment of individuals who are unable to control their behavior and pose a danger to the public. (*Howard N., supra,* 35 Cal.4th at p. 128.) Nothing in *Howard N.* supports Carol's conclusion that these requirements apply to the LPS Act." (*Carol K., supra,* 188 Cal.App.4th at p. 137.) The same should hold true for commitments of the mentally retarded under section 6500.

### 4. CONCLUSION

Precedent has established that substantive due process is satisfied when the civil commitment of an SVP or a former juvenile offender who continues to be dangerous is premised on evidence of the person's dangerous lack of self-control. But there are good reasons not to extend this precedent to the different kinds and degrees of danger presented by individuals who are dangerous to themselves by virtue of their mental retardation. An unreasonably high threshold may deprive some of these individuals of helpful government services the Legislature intended to grant to them.

In my view, a civil commitment under former section 6500 would satisfy substantive due process so long as a qualified expert offers a specific and

credible explanation of how a person's mental retardation makes him or her a danger to self or others. This would require, at a minimum, an articulated nexus between the person's mental retardation and dangerousness. The danger may involve a lack of self-control or other types of danger, such as an inability to perceive threats or an inability to care for oneself. This threshold, which is different from and lower than that of *Bailie* and *Sweeney*, was not met in this case and would require reversal if applied here.

On January 29, 2013, the opinion was modified to read as printed above.