Filed 3/9/21  P. v. W.B. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>W.B.,<br><br>    Defendant and Appellant. | F080395<br><br>(Super. Ct. No. MI-6651)<br><br>**OPINION** |

-ooOoo-

APPEAL from an order of the Superior Court of Kern County.  Cynthia L. Loo, Commissioner.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant.

Cynthia J. Zimmer, District Attorney, and Michael A. Caves, Deputy District Attorney, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

W.B. appeals from an order following a bench trial on November 13, 2019, finding him a developmentally disabled person dangerous to himself or others, and committing him for one year under Welfare and Institutions Code section 6500 (section or § 6500). In part, W.B. argues the expert's opinions that W.B. is currently dangerous and that his developmental disabilities are causally linked to his difficulty controlling his dangerous behavior did not constitute substantial evidence to support the commitment order.

The one-year commitment order, however, expired on November 13, 2020. As a result, W.B. has either been released from commitment or, likely, has been recommitted pursuant to a new order on a different record, which is the process for recommitment under section 6500. Thus, this appeal is technically moot. No decision we make regarding the 2019 commitment order at issue can affect W.B.'s current commitment status.

Despite this, we exercise our discretion to address the substantive arguments presented: neither party has sought to dismiss the appeal as moot, the issues have been fully briefed, and we find merit in W.B.'s substantial evidence argument—an important issue likely to recur yet evade review.

## FACTUAL SUMMARY

### I. Petition for Commitment and Psychological Evaluation Certifications

On August 27, 2019, the Kern County District Attorney filed a petition pursuant to section 6500, et seq. The petition alleged facts that W.B. poses a danger to himself and/or others and that his developmental disability causes him to have serious difficulties controlling his dangerous behavior. The petition alleged W.B. had a mild intellectual disability, an autism spectrum disorder, and that W.B. had also been diagnosed with schizoaffective disorder, depressive type. He had been charged with one count of assault under Penal Code section 220 in March 2017, the court had ordered an evaluation of

2.

competency under Penal Code section 1368, and, in April 2017, Sheila D. Morris, Psy.D., conducted an evaluation and opined he was incompetent to stand trial.

The petition alleged W.B. thereafter became a client of Kern Regional Center in October 2017, and currently resided at Porterville Developmental Center (PDC) pursuant to Penal Code section 1370.1, as incompetent to stand trial due to a developmental disability. The petition alleged that due to W.B.'s poor performance in competency training, it was determined W.B. would not become competent at any time in the near future.

On August 28, 2019, the court issued an order appointing Allison Little, Ph.D., and Michael Musacco, Ph.D., to perform psychological evaluations of W.B. On September 19, 2019, Little's and Musacco's psychological evaluations of W.B. were filed with the court, along with their certificates attesting W.B. was developmentally disabled, he was dangerous to himself and/or others, his developmental disabilities were a substantial factor in causing him serious difficulty in controlling his dangerous behavior, and that placement in a state hospital/developmental center was the least restrictive placement necessary to achieve the purpose of treatment.

## II.    Bench Trial

The commitment proceedings were tried before the court. At the outset, the parties stipulated as follows: "[I]n 2014, [W.B.] became a client of Inland Regional Center, and in March 2017, [W.B.] was arrested and charged with assault with intent to commit rape or sodomy, in violation of Penal Code Section 220, and that he was found incompetent to stand trial on those charges on April 3rd of 2017, and was eventually deemed incompetent, and was remanded to the [PDC], a residential center where he resides."

The People called one witness, Musacco. Musacco had performed an evaluation of W.B. at PDC where W.B. was admitted. As part of that evaluation, he conducted a clinical interview with W.B. in August 2019 that involved asking background questions

3.

about W.B.'s family history, school history, and drug and alcohol history. The interview with W.B. was hampered because W.B. provided little data describing his background or history. According to Musacco, many times during the interview W.B. provided no kind of response or the response "didn't make a whole lot of sense." W.B.'s answers were often brief or "off point," and Musacco was not able to obtain any detail describing any aspect of W.B.'s history.

Musacco considered W.B. to have little insight or self-awareness, and he would not open up to Musacco at all. W.B. refused to acknowledge any problematic behaviors and he did not indicate any difficulty living in the community without supervision, which Musacco felt "didn't show a great deal of insight." During the interview, W.B. admitted a physical altercation with his roommate at PDC, but W.B. was unable to describe the events that led up to that altercation.

Musacco performed a nonverbal IQ test, and W.B. obtained a score that fell in the low borderline range, which Musacco felt overestimated W.B.'s abilities. W.B. was evaluated in 2014 and had obtained a full-scale IQ score of 46, but Musacco felt that underestimated W.B.'s intelligence.

As far as record review, Musacco indicated he did not have detailed records for the evaluation. He was provided with an individual program plan (IPP) completed in 2019 and generated by the Kern Regional Center, which described a person's function and the services the individual is receiving to maintain their functioning. He also reviewed several psychological reports that had been completed at PDC in the prior year. Musacco believed there were several incident reports that described only topically, but not in detail, some of the behavior problems W.B. had within the last year. Musacco also had access to his prior psychological evaluation of W.B. from 2017, which contained reference to an arrest report that described the initial charges for which W.B. was brought into the judicial system in 2017. Finally, just prior to his testimony, the prosecutor had given Musacco interdisciplinary notes from PDC that were consistent with the chart

4.

information Musacco reviewed when he conducted W.B.'s evaluation at PDC. Those appeared to have been authored primarily by social workers and psychiatric technicians at PDC.

Musacco was asked what he learned from these records that was significant in forming his evaluation in this case. Musacco testified the records described symptoms that were suggestive of a psychotic illness and there were references to numerous instances where W.B. allegedly threatened persons with harm, to beat them up or break their jaw, or he made sexually threatening comments to people.

Musacco testified a report noted concern that W.B. was psychotic and a danger to others. There was a note that W.B. threatened to beat up people or referred to them in racially derogatory terms. Musacco recited from the document that W.B. purportedly said to staff he was "gonna break your jaws and rip the television off the wall." Another note indicated W.B. cursed at a staff member, called her "retarded," and said "just wait until I knock you out." Another note Musacco testified about apparently indicated W.B. had threatened a staff member by saying "if you don't feed me and I don't want that other stuff, I will hunt you down and dismember your children." The records Musacco had reviewed for his evaluation of W.B. did not have "a lot of specific details" like those contained in the subpoenaed PDC interdisciplinary notes. Musacco testified W.B.'s statements in these records weigh in favor of his opinion.

After relating the content of some of the interdisciplinary notes, Musacco opined W.B. met the criteria for an intellectual disability and autism spectrum disorder. He also opined W.B. posed a risk of harm to others because when he had last been out in the community there had been an allegation of assault and there was no reason to believe W.B.'s condition had changed since then in a positive way that would reduce the risk if he were released without supervision. He opined W.B. posed a risk of harm to others because of his developmental disabilities, and Musacco believed W.B.'s developmental

5.

disabilities were a substantial factor causing W.B. to have difficulty controlling his dangerous behavior. Musacco opined PDC was a good placement for W.B.

One witness, W.B.'s mother, testified on W.B.'s behalf. W.B. had always lived at home with her except for one month when he moved into his own apartment. Mother wanted W.B. to get a feel for how it was to be on his own and to develop more life skills. W.B.'s apartment was just down the street, and she was able to keep an eye on him and help him shop and run errands. W.B. ended up moving back in with her because it was what was comfortable for W.B.

Mother indicated W.B. had never been in trouble before this or had gone to jail before the 2017 incident. She had never witnessed her son making any threats. She found W.B. to dislike crowds and that he did want to be around fights, either. He had been labeled "retarded" when he was around four years old by a school he attended, but she felt that was not accurate. Were W.B. to be released to her care, she would like for him to work again at the thrift shop where he had worked in the past. She would able to supervise him. Her plan would be to relocate them to Louisiana where they were from originally.

### III. Court's Order

The court credited Musacco's opinion that W.B. presents a danger to himself or to others and that his developmental disability is a substantial factor in causing him serious difficulty controlling his dangerous behaviors. The court concluded W.B. is a developmentally disabled person who is a danger to himself or others and that his mental disorder causes him to have serious difficulty controlling his dangerous behavior. The court found the least restrictive placement was a developmental center and ordered W.B. be committed to the State Department of Developmental Services for placement. The court expressly held the order of commitment was to expire one year from that date, November 13, 2019.

# DISCUSSION

As noted, the commitment order in this case expired one year after it was entered, which was on November 13, 2019, and this appeal is technically moot. (§ 6500, subd. (b)(1)(A).) W.B. has either been released or has been recommitted under a new set of facts. (See § 6500, subd. (b)(1)(B).) However, because the issues are of recurring importance and properly presented by the parties, we exercise our discretion to decide the case on the merits. (See *People v. Barrett* (2012) 54 Cal.4th 1081, 1092, fn. 7; *People v. Wilkinson* (2010) 185 Cal.App.4th 543, 547 ["Since a section 6500 order typically will expire before an appeal can be heard, the issues will evade review unless we exercise our discretion to address the merits of the issues."].)

## I.     There was a Lack of Substantial Evidence to Support the Commitment

W.B. argues Musacco's opinions that W.B. is dangerous and that his developmental disabilities cause him serious difficulty in controlling his dangerous behaviors were speculative, conclusory and do not constitute substantial evidence to support the commitment order. The People argue Musacco's opinions addressed the issues and constituted substantial evidence to support the determination.

### A.     Legal Standard and Standard of Review

Section 6500, subdivision (b)(1), provides that "[a] person with a developmental disability may be committed to the State Department of Developmental Services for residential placement other than in a state developmental center or state-operated community facility … if the person is found to be a danger to self or others." Such an order of commitment expires automatically after one year. (§ 6500, subd. (b)(1)(A).) "If the person with a developmental disability is in the care or treatment of a … developmental center … at the time a petition for commitment is filed pursuant to this article, proof of a recent overt act while in the care and treatment of [the] developmental center … is not required in order to find that the person is a danger to self or others." (*Id.*, subd. (b)(3).)

7.

The prosecution had the burden to prove beyond a reasonable doubt that W.B. was developmentally disabled and a danger to himself or to others, and that his developmental disability was a substantial factor in causing him serious difficulty controlling his dangerous behavior. (*In re O.P.* (2012) 207 Cal.App.4th 924, 928; see *Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1158 ["due process *requires* an inability to control dangerous conduct"].) The evidence must show proof of current dangerousness linked to the defendant's developmental disability. (*In re O.P.*, *supra*, at p. 932 ["due process demands proof of current dangerousness, linked to the defendant's [developmental disability]"].)

To determine whether these elements are supported by sufficient evidence, we must review the entire record in the light most favorable to the People, and we presume in support of the order of commitment the existence of every fact the court could deduce from the evidence, which must be reasonable, credible, and of solid value. (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 106–107.)

### B.    Analysis

#### 1.    Musacco's Opinion of W.B.'s Dangerousness

W.B. contends Musacco's opinion that W.B. presents a danger to himself and/or others as a result of his developmental disabilities was entirely speculative and conclusory because it was based on only two incidents—the 2017 charged offense and an altercation with a roommate at PDC in March 2018—about which there were few details for Musacco to consider. As such, Musacco's opinion did not rise to the level of substantial evidence.

The danger referenced in section 6500 must involve conduct that presents the likelihood of serious physical injury. (*People v. Hartshorn* (2012) 202 Cal.App.4th 1145, 1153–1154.) "The vagaries of emotional injury, mere apprehension of physical injury, speculation and conjecture are not enough to justify the need for commitment." (*Id.* at p. 1154.) There must be evidence of current dangerousness and "not merely a

8.

prosecutor's allegation that an incompetent person committed a felony." (*In re O.P., supra*, 207 Cal.App.4th at p. 934.)[1]

"Although it is true that the testimony of a single witness, including the testimony of an expert, may be sufficient to constitute substantial evidence [citation], when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' or on 'assumptions … not supported by the record,' the expert's opinion 'cannot rise to the dignity of substantial evidence' and a judgment based solely on that opinion 'must be reversed for lack of substantial evidence.'" (*Wise v. DLA Piper LLP (US)* (2013) 220 Cal.App.4th 1180, 1191–1192.) Similarly, "when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.'" (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117; cf. *Thai v. Stang* (1989) 214 Cal.App.3d 1264, 1276 [expert's conclusory declaration regarding causation not competent evidence raising issue of fact on causation for purposes of summary judgment].)

---

[1]     Section 6500, subdivision (a)(1), provides that "'[d]angerousness to self or others'" includes incompetence to stand trial when a defendant has been charged with specified violent crimes, and also includes being charged with a felony involving death, great bodily injury, or an act that poses a serious threat of bodily harm to another person. A violation of Penal Code section 220 is one of the enumerated felonies under section 6500, subdivision (a)(1), but only when the victim suffers great bodily injury, which is not itself an element of Penal Code section 220. Here, there was no stipulation the alleged violation of section 220 involved great bodily injury to the victim, and there were no facts offered to show the circumstances of W.B.'s charged offense posed a serious threat of bodily harm to the victim. (See *In re Fuller* (1981) 124 Cal.App.3d 251, 255 [considering identical language under Penal Code section 1026.5, former subdivision (b)(1), in the context of habeas corpus petition, court concluded "[d]epending on the facts, a kidnaping or assault to rape may constitute" "'an act which poses a serious threat of bodily harm to another person'"].) The trial court did not make any findings in that regard, and neither party argues on appeal dangerousness was established statutorily by the felony charged and/or the facts or circumstances involved.

The parties stipulated that W.B. was arrested and charged with assault with intent to commit rape or sodomy in March 2017, but no other details about those charges were offered at trial. Musacco had reviewed those charges, apparently in forming his opinion W.B. was incompetent to stand trial, but it is not clear from his trial testimony he knew any of the context or details underlying that criminal complaint. As to the incident in March 2018 with W.B.'s roommate, Musacco acknowledged W.B. was unwilling or unable to provide any details about the altercation. On cross-examination, Musacco indicated interdisciplinary notes from PDC showed the roommate had hit W.B. first, and then W.B. had responded.[2] Beyond that, although Musacco had reviewed chart notes while at PDC conducting his evaluation, Kern Regional Center's IPP notes, and several psychological reports generated in the prior year at PDC, those records were not admitted. Despite reference to a scattered handful of threats against staff at PDC, there was no evidence any of the threats had led to physically aggressive behavior. The factual basis for Musacco's opinion of dangerousness was not well demonstrated.

Moreover, the reasons why these behaviors or incidents demonstrated dangerousness was not explained. Musacco testified W.B. represented a risk of harm to others because when W.B. had last been out in the community, he had been charged with assault and Musacco did not believe his condition had changed in a positive way since then to reduce his risk. Musacco did not demonstrate he knew much about the incident that led to the 2017 charge of assault. And, even more importantly, Musacco did not explain how this incident or any other behaviors noted, including those referenced in the subpoenaed interdisciplinary notes, supported his opinion W.B. was currently a danger to himself or others. Such an explanation was especially critical since the scant details of

---

**2** Musacco reviewed subpoenaed interdisciplinary notes at trial, which he explained on cross-examination indicated the altercation in March 2018 was instigated by W.B.'s peer, and W.B. responded by throwing a chair at the peer—it was not explained whether the peer was injured or whether the chair thrown by W.B. was in self-defense.

10.

W.B.'s underlying behaviors did not provide manifest and obvious indicia of current dangerousness.

Without an instructive analysis as to why these incidents were indicative of W.B.'s current dangerousness, Musacco's ultimate opinion in this regard was merely conclusory. This is not to say Musacco would have been unable to explain how the documents he reviewed or what aspects of his clinical evaluation of W.B. were significant in forming his opinion, but no testimony like this was elicited. The trier of fact was left to guess what facts were consequential to Musacco in reaching his opinion. (*People v. Bassett* (1968) 69 Cal.2d 122, 141 ["'The chief value of an expert's testimony in this field, as in all other fields, rests upon the *material* from which his opinion is fashioned and the *reasoning* by which he progresses from his material to his conclusion; … it does not lie in his mere expression of conclusion.'"].)[3]

### 2.  Causative Link Between Disability and Difficulty Controlling Behavior

Due process demands a showing that the potential committee's developmental disabilities are causally linked to the person's difficulty controlling behavior. (*In re O.P.*, *supra*, 207 Cal.App.4th at pp. 928, 932.) In other words, the evidence must show the developmentally disabled person has serious difficulty controlling his dangerous behavior because of his developmental disability. (*People v. Sweeney* (2009) 175 Cal.App.4th 210, 225 ["[I]t must be the person's mental deficiency, disorder, or abnormality that causes the serious difficulty controlling behavior."].)

---

**3**     To be clear, Musacco's testimony was not rendered insubstantial because the underlying records he reviewed and/or relied upon were not admitted into evidence (*People v. Nicolaus* (1991) 54 Cal.3d 551, 582–583 [affirming trial court's refusal to admit journal articles and letters upon which expert relied]), nor are we suggesting Musacco was permitted to relate case-specific hearsay he relied upon in forming his opinion such as the specific details of any police report he reviewed (*People v. Sanchez* (2016) 63 Cal.4th 665, 686 [expert cannot relate as true case-specific facts asserted in hearsay statements unless proven by competent evidence or covered by a hearsay exception]).

11.

Here, there was evidence W.B. had suffered from the identified developmental disabilities since childhood, but there was no admitted evidence of any violent tendency until 2017, when W.B. was approximately 30 years old. Developmental disabilities do not necessarily lead to or cause difficulty in controlling dangerous behavior. Musacco did not explain why W.B., despite having suffered these disabilities since childhood, suddenly had serious difficulty controlling his purportedly dangerous behavior because of those disabilities. Without explanation, there is no obvious causative link between W.B.'s developmental disabilities and his difficulty controlling his behavior. (*People v. Bassett*, *supra*, 69 Cal.2d at pp. 141–146 [expert opinions must be based on facts and supported by *reasons* for the conclusions reached].) Simply put, Musacco's testimony was undeveloped in this regard and left his ultimate conclusions unexplained. The trier of fact was not positioned, nor are we, to fill the gaps in the testimony by independently deciding which facts were clinically significant and then analyzing how those facts supported Musacco's ultimate conclusion.

This lack of explanation as to how W.B.'s developmental disabilities *cause* his serious difficulty controlling his behavior is especially glaring because Musacco testified there were several notations in the records that W.B. suffered from psychosis and exhibited psychotic symptoms. One of the IPP narrative reports Musacco testified about described a concern that W.B. was psychotic and a danger to others without any other details. This notation points to a connection between W.B.'s purported dangerousness and psychosis, not to any connection between dangerousness and his developmental disabilities. Beyond characterizing this note as unspecific, it is entirely unexplained why Musacco believed W.B.'s developmental disabilities rather than this noted psychosis caused his serious difficulty in controlling his behaviors. (See *People v. Cuevas*, *supra*, 213 Cal.App.4th at pp. 107–108 [no substantial evidence of link between developmental disability and serious difficulty controlling dangerous behavior, but there was evidence dangerous behavior attributable almost entirely to mental illness].) Musacco may well

12.

have been able to explain what factors showed W.B.'s developmental disabilities, even in light of noted psychotic symptoms, were the primary factors driving his difficulty controlling his behavior, but any such testimony was critically missing.

Musacco's conclusory opinions did not rise to the level of substantial evidence—there had to be facts identified by Musacco as clinically significant and a reasoned basis why those facts supported the ultimate conclusions reached; without this critical link, the opinions were of no evidentiary value and could not constitute substantial evidence. (*People v. Bassett*, *supra*, 69 Cal.2d at pp. 141–146.) As a result, the commitment order is not supported by substantial evidence.

## II.     Case-specific Hearsay

Given our conclusion as to substantial evidence, we decline to reach the issue of whether Musacco's recitation of W.B.'s statements recorded in the interdisciplinary notes was inadmissible case-specific hearsay under *People v. Sanchez*, *supra*, 63 Cal.4th 665.

## DISPOSITION

Due to the expiration of the commitment order, the appeal is dismissed as moot.


MEEHAN, J.

WE CONCUR:




POOCHIGIAN, Acting P.J.




DESANTOS, J.

13.