Filed 4/13/21  Kern Regional Center v. R.G. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERN REGIONAL CENTER, Plaintiff and Respondent, v. R.G., Defendant and Appellant. | F081642 (Super. Ct. No. MI003546-00) OPINION |

### THE COURT[*]

APPEAL from an order of the Superior Court of Kern County.  Thomas S. Clark, Judge.

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Hill, P.J., Franson, J. and DeSantos, J.

R.G. appeals from an order adjudging him a developmentally disabled person who is a danger to himself and/or others and committing him to the custody of the State Department of Development Services. (Welf. & Inst. Code, § 6500.)[1] He contends that the trial court's conclusion violated his Fourteenth Amendment due process rights because there was insufficient evidence for the court to have concluded that a causal relationship existed between his developmental disability and his dangerousness. Kern Regional Center has not responded. We affirm.

## PROCEDURAL SUMMARY

On February 5, 2020,[2] the Kern County District Attorney filed a petition for commitment of R.G. as a person with a developmental disability who is a danger to themselves or others (§ 6500, subd. (b)(1)). The petition alleged R.G. was admitted to Napa State Hospital in 1996, after having been found incompetent to stand trial (Pen. Code, § 1368) on charges of exposing himself to a minor (Pen. Code, § 314). R.G. has been committed since 1996. The petition further alleged that R.G. "has a long history of maladaptive and dangerous behaviors, including indecent exposure, alcohol abuse, burglary, AWOL attempts, solicitation of prostitution, and breaking and entering. [He] continue[d] to acknowledge a sexual attraction to underage girls, and admit[ted] to fantasizing about them in a sexual way." It alleged that "Kern Regional Center believes that [R.G.] would be a danger to himself and others if placed in a less restrictive setting at this time."

On July 20, the trial court conducted a bench trial. At the conclusion of the trial, the court concluded R.G. was a developmentally disabled person who was a danger to himself and/or others as a result of his developmental disability. The court further

---

**1**    All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**2**    All further dates refer to the year 2020 unless otherwise stated.

concluded that the "least restrictive placement necessary to achieve the purposes of treatment is a residential facility, a group home where he can obtain the benefit of constant supervision and assistance." The trial court therefore ordered R.G. committed to the California Department of Developmental Services for appropriate placement.

On August 26, R.G. filed a notice of appeal.

## FACTUAL SUMMARY

On July 20, DeeDee Hallmark was the lead staff member in the group home where R.G. lived. She had supervised R.G. for approximately one- and one-half years. R.G. acknowledged to Hallmark and Doctor Michael Musacco—a clinical psychologist who assessed R.G.—that he was attracted to female preadolescents.

Part of Hallmark's duties was taking the group home residents on supervised community outings. She had taken R.G. on outings roughly 10 to 15 times in the past year. During those outings, she noticed that when R.G. walked near children he would "tip[] his head down[,]" as he was instructed to do, but he appeared to be so uncomfortable that he shook slightly and took "stutter steps" or "baby steps" until he was no longer near the child. Hallmark also noticed that when R.G. "put[] his head down" in those situations, he "glanc[ed] at [her] to see if [she was] watching him. If he [thought she was] not watching, then he lift[ed] his head [to look at the child or children] and [Hallmark or other staff] ha[d] to redirect" him. In the preceding year, R.G. looked at preadolescent girls "[w]henever they [were] around" and "[a]t least 10 times." If Hallmark or another staff member did not redirect R.G., Hallmark believed his focus would remain on the preadolescent female. Hallmark also observed R.G. watch a film that displayed children despite having been directed not to do so and learned of him making a sexual comment to a group home staff member. Further, Hallmark observed R.G. misunderstand friendliness from a woman who served him at a coffee shop and develop a "full-fledged fantasy" about moving out of the group home and in with her.

3.

At other times, R.G. successfully went on public outings without requiring external redirection. In one instance, he advised staff that he needed to leave a restaurant because a young girl had entered the restaurant and triggered him. Based on R.G.'s reaction to seeing young girls in public, Hallmark believed that he was "struggling with it or tr[ying] to control [his] urges."

Musacco conducted evaluations of R.G. for 16 or 17 years. His most recent evaluation of R.G. was on February 5. Based on his interaction with R.G., R.G.'s history of requiring assistance in conducting daily living activities, and R.G.'s prior attendance at a school for children with intellectual disability, Musacco concluded that R.G. has had a chronic, lifelong moderate intellectual disability. Musacco also concluded that R.G. had "pedophilic disorder"—a "chronic sexual interest in prepubescent children that[ had] been present … throughout most of his life." R.G. had acknowledged his sexual interest in preadolescent females to Musacco during Musacco's interview of him. The pedophilic disorder was "controlled … or in remission due to the supervision that he receive[d] through his group home." R.G.'s intellectual disability and pedophilic disorder "can aggravate one another." For instance, "his ability to … develop coping skills to deal with [his] pedophilic disorder may be hampered because of the intellect[ual] disability." R.G. also had a speech and hearing disability.

Musacco opined that as a result of R.G.'s developmental disability and pedophilic disorder, he would be unable to safely function in the community if he was not supported with full-time supervision. Specifically, as a result of his developmental disability, R.G. would struggle with "basic meal preparation …, money … management, … safety awareness, getting to and from doctor appointments …[,] having clean clothes[,] and [keeping] food [in the] refrigerator." While R.G. may not have been a self-harm or suicide risk, he posed a risk to himself because he is unable to care for his own "daily living needs." Musacco also opined that "if he were living independently, … [R.G.] would [also] pose a high risk for recidivism in a sexual way …." That is so in part

4.

because, as a result of his developmental disability, "he is unable to inhibit dangerous behaviors." Because "his ability to learn from experience, develop rational thoughts and understand cause and effect is hampered[,]" he was at a "higher risk for any kind of inappropriate overture tha[n] a person without an intellectual disability …." That kind of inappropriate overture in public and to people not familiar with his condition could "result in re-incarceration or some sort of physical altercation." Musacco opined that placement in a supervised community care facility was the least restrictive safe placement option for R.G.

## DISCUSSION

R.G. argues that substantial evidence was not presented to establish a causal link between his developmental disability and his dangerousness.[3] Instead, R.G. argues, the trial court erroneously relied upon his mental illness—pedophilic disorder—to conclude that he was dangerous. We disagree and therefore affirm.

Section 6500, subdivision (b)(1), states: "A person with a developmental disability may be committed to the State Department of Developmental Services for residential placement other than in a state developmental center or state-operated community facility … if the person is found to be a danger to self or others." Such an order of commitment expires automatically after one year. (§ 6500, subd. (b)(1)(A).)

In a proceeding pursuant to section 6500, the prosecution has the burden to prove beyond a reasonable doubt that the person to be committed was developmentally disabled and a danger to himself or to others, and that his developmental disability was a substantial factor in causing his serious difficulty controlling his dangerous behavior. (*In re O.P.* (2012) 207 Cal.App.4th 924, 928.) The evidence must show proof of current dangerousness linked to the committed person's developmental disability. (*Id*. at p. 932.) Specifically, the developmental disability must be a substantial factor in causing the

---

[3] Defendant does not dispute the developmental disorder finding.

person serious difficulty in controlling his behavior. (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 107.) "[T]he 'danger' referenced in section 6500 must involve conduct that presents the likelihood of serious physical injury." (*People v. Hartshorn* (2012) 202 Cal.App.4th 1145, 1153–1154.) "The vagaries of emotional injury, mere apprehension of physical injury, speculation and conjecture are not enough to justify the need for commitment." (*Id.* at p. 1154.)

To evaluate R.G.'s argument that a causal link between his developmental disability and his dangerousness was not supported by sufficient evidence, we review the entire record in the " ' "light most favorable to respondent," ' " and we presume in support of the order of commitment " ' "the existence of every fact the [court] could reasonably deduce from the evidence[,]" … ' [which] must be … ' "reasonable in nature, credible and of solid value." ' " (*People v. Cuevas*, *supra*, 213 Cal.App.4th at pp. 106–107.)

Here, Musacco testified that, as a result of R.G.'s developmental disability, R.G. could not care for his physical needs like going to the doctor and feeding himself. He further testified that as a result of his developmental disability, he could not inhibit his dangerous behaviors or understand cause and effect. Those deficits resulted in his making inappropriate sexual overtures that might be poorly received if made outside of a controlled environment. For all those reasons, Musacco opined that R.G.'s developmental disability therefore caused R.G. to be a danger to himself or others. Musacco's opinions were nonspeculative and were based on his interviews of R.G. and Hallmark and his review of the group home staff notes regarding R.G.'s conduct. (*People v. Hartshorn*, *supra*, 202 Cal.App.4th at p. 1154.) Although R.G.'s mental condition may also have contributed to his dangerousness, in the light most favorable to the order of commitment, substantial evidence supported the trial court's conclusion that defendant's developmental disability was a substantial cause of his likelihood of causing serious physical harm to himself or others within the meaning of section 6500.

## DISPOSITION

The order is affirmed.