Filed 5/21/21  Kern Regional Center v. H.S. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERN REGIONAL CENTER, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> H.S., <br><br> Defendant and Appellant. | F081442 <br><br> (Super. Ct. No. MI-3687) <br><br><br> **OPINION** |

-ooOoo-

## THE COURT*

APPEAL from an order of the Superior Court of Kern County.  Marcos R. Camacho, Judge.

Rachel Lederman, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

-ooOoo-

---

\*      Before Levy, Acting P.J., Poochigian, J. and DeSantos, J.

H.S. appeals from an order adjudging him a developmentally disabled person who is a danger to himself and/or others and committing him to the custody of the State Department of Developmental Services in an outpatient placement with supported living services supervision 24 hours a day, seven days a week. (Welf. & Inst. Code, § 6500.)[1] He contends that the trial court's conclusion violated his Fourteenth Amendment due process rights because there was insufficient evidence for the court to have concluded that 24-hour supervision is the least restrictive appropriate placement. Kern Regional Center has not responded. We affirm.

## PROCEDURAL SUMMARY

On April 1, 2020,[2] the Kern County District Attorney filed a petition for commitment of H.S. as a person with a developmental disability who is a danger to themselves or others (§ 6500, subd. (b)(1)). The petition alleged H.S., "age 75, presents Mild Intellectual Disability (IQ=63–73), Antisocial Behavior Disorder, Cognitive Disorder and Paraphilia (NOS). In the past, he was diagnosed with Sexual Sadism (in institutional remission), Dementia, and Anti-Social Personality Disorder. His Dementia is due to a head injury, which occurred when he was in the 7th grade. [His] head injury resulted in a major change in his cognitive status. Soon after this occurrence, he was expelled from the 7th Grade for molesting young girls and was made a ward of the Court."

The petition further alleged H.S. was released in 1972. In 1984, he was convicted of kidnapping and assault with a deadly weapon and served time in prison. In 1991, he was charged with four counts of sodomy by force but was found incompetent to stand trial (Pen. Code, § 1370.1) and committed to the Stockton Developmental Center.

---

**1** All further statutory references are to the Welfare and Institutions Code unless otherwise stated.

**2** All further dates refer to the year 2020 unless otherwise stated.

2.

H.S. has not regained competency; his commitment has been repeatedly renewed (§ 6500). In that time, he was transferred between multiple treatment centers until 2009, when he reached his current placement—his own apartment where he receives 24-hour supported living services.

The petition alleged H.S.'s transfer to supported living was largely positive and his problem behaviors decreased. However, H.S. had also displayed noncompliant and combative behavior toward supported living staff regarding his medications. The petition alleges he took a bottle of his medication that staff normally distribute for him at specified times and refused to give it back. When asked to return the bottle he became verbally combative and told staff that he was able to administer his own medication. However, when asked what times he took his medications, H.S. was unable to verbalize his medication times and thereafter was unable to remember to take his medications without staff prompting. H.S. had similar problems accepting nebulizer treatments for his COPD. He repeatedly told staff he did not need the treatment but accepted the treatments when provided.

The petition further alleged H.S. "has open behavioral plans for maladaptive sexual behavior, emotional outburst/verbal aggression, poor hygiene, inappropriate social behavior and [engages in inappropriate] horseplay," all as a result of his developmental disability. In the most recently reported period,[3] he has displayed maladaptive sexual behavior two to four times per month. For example, he touches staff on the arms, legs, and shoulders; he has expressed romantic interest in a neighbor (who may not be interested in him); and he stares at the breasts of women in the community, neighbors, and staff. Staff that monitor H.S. have opined that he "continues to exhibit behaviors that

---

**3**     The petition alleged frequency of problem behaviors based on notes from the first half of 2019.

3.

lead [them] to believe that he is still capable of assaulting women under the right conditions."

The petition alleged H.S. has emotional outbursts and/or verbal aggression between two and 10 times per month. He needs verbal prompting five days per week to successfully complete daily hygiene tasks. He required redirection at least seven times over the course of a "few months" when he attempted to visit his elderly neighbor's apartment between 10:00 p.m. and 7:00 a.m. In one incident, H.S. refused staff's attempts at redirection and stood outside the same woman's "apartment in the early hours of the morning yelling her name and yelling for her to open the door."

The petition alleged H.S. "shows little regard for his personal safety." He goes outside between midnight and 6:00 a.m. to smoke cigarettes, leaves his doors and windows unlocked at night and when he goes to the store, and refuses to close his windows at night, even when the temperatures drop to the low 30's.

On July 1, the trial court sustained the petition and concluded that the least restrictive placement necessary to achieve treatment is to continue outpatient placement with supported living services 24 hours per day, seven days per week.

On July 15, H.S. filed a notice of appeal.

**FACTUAL SUMMARY**

**A. Rebecca Thorson**

On July 1, Rebecca Thorson was a manager for a supported living agency that supported developmentally disabled adults, including H.S. She had worked for the agency for 10 years and with H.S. for four years. She presently did not provide care directly for H.S., but she did supervise those who provided his care. She also kept the progress notes taken by H.S.'s caretakers.

Thorson summarized all the incidents of note that were reflected in the progress notes between January 2019 and June 30: H.S. needed redirection regarding his physical health and safety. For instance, H.S. was directed to not share cigarettes with neighbors

4.

because they have germs, at least twice to bathe, twice to not leave his food cooking unattended on the stove, once to not lean on the hot stove, and three times to not sit or stand in the rain. He also refused medication five times. On one occasion, H.S. became upset that he was not permitted to manage his own medication. He took a bottle of his medication and refused to return it. Thorson made a deal with H.S. that if he could request his medication at appropriate times for two weeks, then he could manage his own medication. H.S. was unable to do so.[4]

H.S. did not understand that there are inappropriate times and purposes to visit neighbors. He attempted three times in one day to use a neighbor's telephone to make a long distance call. He twice yelled at neighbors. On at least 15 occasions he approached neighbors asking for cigarettes, one time waking his neighbor between midnight and 8:00 a.m. for that purpose. H.S. had inappropriately touched staff on at least 14 instances, despite being told to keep his hands to himself. H.S. also needed redirection regarding "maladaptive sexual behavior." On two occasions, he was redirected while watching a neighbor girl playing outside.[5] H.S. also made aggressive and/or sexual comments toward staff on at least 10 occasions.

Based on her observations of H.S., Thorson opined that "he could [not] do well" living independently.

### B. Dr. Michael Musacco

On March 18, Dr. Michael Musacco conducted a mental status evaluation of H.S. and discussed his condition with the assigned supported living services staff. During the evaluation, H.S. appeared confused and had difficultly "follow[ing] the conversation in a logical manner." Musacco explained that H.S. is diagnosed with "an intellectual disability" as a result of a brain injury when he was young, "which is a chronic kind of

---

[4]     According to the § 6500 petition, H.S. is prescribed 18 different medications.

[5]     H.S.'s offenses previously targeted adult females and children.

steady condition," but he is also "diagnosed with dementia, which is a condition involving a progressive deterioration of his mental acuity." As a result, H.S.'s cognitive functioning had "declined substantially over the years … to the extent that it's fairly difficult to have back-and-forth coherent conversation with him." During the evaluation, H.S. was unable to provide the correct date, month or year, did not know the number of days in a week, did not know the number of months in a year, misidentified his age, and was unable to identify the names or functions of any of his medications.

Further, while H.S. expressed a desire to "function and live independently, he wasn't able to show any insight into his need for care or supervision." For example, when he was confronted about refusing medication for a diagnosed breathing condition, his answer was that he did not need the medication because he did not have a breathing condition. In years past, H.S. recognized his need for care, at least in providing medication, assistance with transportation, and food preparation. Musacco attributed H.S.'s decline in insight to his dementia.

Musacco opined that H.S. could not live independently in the community because he "would be immediately a serious risk of harm to himself." He further opined that any placement less restrictive than his current placement "would be insufficient to help him maintain his safety and the safety of those around him."[6]

### C. H.S.

H.S. testified that he was able to care for himself. He cooked his own meals, cleaned his home, bathed himself,[7] and was usually able to take his own medicine. He

---

[6] Musacco commented that, as H.S. has aged, he has become less physically able and "would be unable to incapacitate a healthy adult female…." The "bigger concern [Musacco] ha[d] for him … [was] the ability to care for himself." Nevertheless, Musacco opined that "obviously, there [was] a concern for others given [H.S.'s] history of assaultive behaviors."

[7] H.S. testified that he did not want staff's assistance, in part, because they falsely reported that he did not shower.

previously inadvertently took the wrong medication—a sleeping pill—but he did not believe he would do so again. He did not think he needed his breathing machine. Instead, he planned to smoke fewer cigarettes. He acknowledged, however, that it would be difficult for him to stop smoking because he had been smoking since he was 14 years old.

H.S. also testified he would not reoffend because he spent most of his time listening to music on his radio and praying.

H.S. mistakenly believed the day was Thursday (it was Wednesday), the month was May or December (it was July), and the year was 2000 (it was 2020). He also mistakenly believed that there were "about a hundred … days in a week" and "hundreds" of months in a year.

## DISCUSSION

H.S. argues that substantial evidence was not presented to support the trial court's finding that the most appropriate and least restrictive placement was outpatient placement with supported living services 24 hours a day, seven days a week.[8] We disagree and therefore affirm.

Section 6500, subdivision (b)(1), states: "A person with a developmental disability may be committed to the State Department of Developmental Services for residential placement other than in a state developmental center or state-operated

---

[8] H.S. does not dispute the findings that he has a developmental disability, and that he poses a danger to himself as a result of that disability. However, he contends that "[i]t is undisputed" that he is currently not dangerous to others. The record does not support his contention. Musacco opined that H.S., because of his age, could not overpower a "healthy adult female," but concluded that he still posed a risk of harm to others because of his history of assaultive behaviors. Musacco's opinion is consistent with the information relayed by Thorson from the progress notes, detailing H.S.'s observing a female child, touching staff, shouting at neighbors, and making aggressive and/or sexual comments to staff.

community facility … if the person is found to be a danger to self or others." Such an order of commitment expires automatically after one year. (§ 6500, subd. (b)(1)(A).)

In a proceeding pursuant to section 6500, the prosecution has the burden to prove beyond a reasonable doubt that the person to be committed was developmentally disabled and a danger to himself or to others, and that his developmental disability was a substantial factor in causing his serious difficulty controlling his dangerous behavior. (*In re O.P.* (2012) 207 Cal.App.4th 924, 928.) The evidence must show proof of current dangerousness linked to the committed person's developmental disability. (*Id.* at p. 932.) Specifically, the developmental disability must be a substantial factor in causing the person serious difficulty in controlling his behavior. (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 106–107.) "[T]he 'danger' referenced in section 6500 must involve conduct that presents the likelihood of serious physical injury." (*People v. Hartshorn* (2012) 202 Cal.App.4th 1145, 1153–1154.) "The vagaries of emotional injury, mere apprehension of physical injury, speculation and conjecture are not enough to justify the need for commitment." (*Id.* at p. 1154.)

Once the showing has been made that a person to be committed has a developmental disability that causes the person to be dangerous to themselves or others, the court may place the person only in the most appropriate and least restrictive placement necessary to achieve treatment of the person and safety of the community. (§ 6509, subds. (a), (b)(1); see § 6504.5, subd. (c); *People v. Barrett* (2012) 54 Cal.4th 1081, 1095–1096.)

We review the entire record in the " ' "light most favorable to respondent," ' " and we presume in support of the order of commitment " ' "the existence of every fact the [court] could reasonably deduce from the evidence[,]" ' … [which] must be … ' "reasonable in nature, credible and of solid value." ' " (*People v. Cuevas*, *supra*, 213 Cal.App.4th at pp. 106–107.)

8.

Here, Musacco testified that, as a result of H.S.'s developmental disability, H.S. could not care for his basic physical needs like managing his medications, food preparation, and transportation. Musacco opined, in addition to lacking the ability to care for himself because of his developmental disability, H.S. lacked any awareness that he could not care for himself as a result of his dementia. Musacco's opinion that H.S. could not care for himself was supported by anecdotes from progress notes relayed by Thorson—H.S. was unable to take his medication without prompting and would attempt to refuse some prescribed medication; H.S. occasionally had to be reminded not to leave food cooking unattended and not to lean on the stove; H.S. also occasionally had to be reminded to bathe and insisted that he had bathed when he had clearly not done so. Indeed, H.S. testified that he had once inadvertently taken sleeping medication instead of his prescribed medications. And, although he believed he could administer his own medication, he was previously unable to do so when given the opportunity and routinely refused to take medication. Substantial evidence supported the trial court's finding that H.S. required supported living services 24 hours per day, seven days per week because, if H.S. was unsupervised, he would likely cause himself serious injury.

Beyond the risk that H.S. posed to himself by being unable to care for his basic physical needs, he also posed a risk to himself and others as a result of his inability to control his behaviors in interacting with others. H.S. had to be redirected from attempting to interact with neighbors late at night, shouting at neighbors, staring at a female child, and touching staff. H.S. also appeared not to understand romantic and/or sexual relationships. For instance, he proposed to a staff member, asked a staff member to shower with him, kissed a former staff member on the cheek without permission, asked a staff member to transport him to a grocery store so he could give his telephone number to a young woman who worked there, and asked two nurses, a phlebotomist, and an X-ray technician for their telephone numbers when he went to a doctor's appointment. In all of those situations, a staff member was there to redirect H.S. Without staff

intervention, similar situations would reoccur and could result in serious physical harm to H.S. or others.

Based on H.S.'s inability to care for his basic needs, apparent lack of understanding of romantic and/or sexual relationships, problems with impulse control, and history of offending, as well as Musacco and Thorson's opinions that H.S. could present a risk to himself or others if left alone, substantial evidence supported the trial court's finding that the most appropriate and least restrictive placement was a placement with supervision 24 hour hours per day, seven days per week.

## **DISPOSITION**

The order is affirmed.