Filed 4/26/22  Kern Regional Center v. M.W. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KERN REGIONAL CENTER , <br><br> Plaintiff and Respondent, <br><br> v. <br><br> M.W., <br><br> Defendant and Appellant. | F082910 <br><br> (Super. Ct. No. MI003503-00) <br><br> **OPINION** |

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Kern County.  Marcos R. Camacho, Judge.

Rudy Kraft, under appointment by the Court of Appeal, for Defendant and Appellant.

Cynthia Zimmer, Kern County District Attorney, Esther Schlaerth, Deputy District Attorney, for Plaintiff and Respondent.

-ooOoo-

---

[*]     Before Franson, Acting P. J., Peña, J. and Snauffer, J.

In this appeal, M.W. challenges the sufficiency of the evidence supporting the conclusion he is a developmentally disabled person who is a danger to himself and/or others, resulting in his commitment to the custody of the California Department of State Hospitals at the Kern Regional Center (KRC). M.W. also challenges the term of his commitment as violating his right to equal protection under the constitution. KRC disputes these contentions. Following our review of the record and our consideration of the legal standards governing these forms of commitments, we affirm the findings supporting M.W.'s commitment to KRC, and further conclude there was no violation of M.W.'s constitutional rights. We affirm.

## PROCEDURAL SUMMARY

On May 18, 2020, KRC filed a petition pursuant to Welfare and Institutions Code[1] section 6500 et seq., alleging M.W. was a developmentally disabled person who posed a danger to himself and/or others, and that this disability makes it difficult to control his dangerous behavior. A hearing on the petition was held almost one year later in May and June 2021. On June 16, 2021, the court issued its ruling finding M.W. was a developmentally disabled person who was a danger to himself and/or others, as defined by sections 6500 through 6512, and that his mental deficiency, disorder, and/or abnormality caused him serious difficulty in controlling his dangerous behavior. The court further found that the least restrictive placement for M.W. to achieve the purposes of treatment was a residential or group home.

## FACTUAL SUMMARY

The facts supporting the petition were presented through two witnesses in support of the petition, followed by M.W.'s testimony.

---

[1]     Unless otherwise specified, all further statutory references are to the Welfare and Institutions Code.

1.     **Eric Coronado**

Coronado is an administrator at the group home where M.W. is a resident. Coronado has known M.W. since 2009 when M.W. was transferred from a state hospital, but worked with him specifically during two periods, between 2009 and 2010, and again since 2017.  Coronado has accompanied M.W. often since 2019 when he has gone on "outings" giving residents of the group home the opportunity to leave the home twice a week.  On these occasions, Coronado has observed M.W. staring at children for several seconds, at which time he would remind M.W. to stay focused, resulting in him pulling his eyes away and refocusing on the task.  According to Coronado, this happened anywhere from one to four times an outing depending on where they were and the number of children in the vicinity.  The children M.W. often stared at ranged in age between three and 10, and were of both genders.  These episodes were documented once they returned to the group home.[2]

These outings stopped between March and October 2020 due to Covid, but resumed thereafter.  Coronado testified that because these episodes of staring happened when they were out in the community, M.W. needed more one-on-one support during these outings.

2.     **Dr. Michael Musacco**

Musacco has evaluated M.W. pursuant to section 6500, every year for the past 10 to 11 years on behalf of KRC.  The parties stipulated to Musacco's qualifications to provide testimony and opinions as an expert in this matter.

Musacco's most recent written evaluation was completed in April 2020.  In addition to reviewing various reports completed by the group home, the day program M.W. participates in, and the report issued by M.W.'s therapist, Musacco spoke to M.W.

---

[2]     Several "Daily" notes showing how these incidents were documented, were entered into evidence.

before completing the evaluation. When Musacco specifically asked M.W. about reports he was staring at children, M.W. denied he stared at children. M.W. also denied he had any sexual interest in children, or that he was ever instructed to refocus after allegedly staring at children.

Musacco concluded M.W. required placement in a community care facility which could provide a safety net and the necessary supervision that would allow him to function in the community. Musacco offered his expert opinion that M.W. is developmentally disabled, and that he,

> "poses a risk of harm to others and possibly to himself insofar as his developmental disability results in coping deficits and maybe a failure to understand risk to the extent that without close supervision, I believe that [M.W.] would be a substantial risk for—for a sexual reoffense."

Musacco stated the danger of reoffending was due to a "pedophiliac disorder" which combined with his developmental disability drives him toward more dangerous behaviors, which could pose a problem because of the risk he will not be able to control his urges without staff assistance.

Musacco stated his belief that if M.W. attempted to live independently in the community, there would be a substantial risk he would act in a way that would be harmful to himself or others. For this reason, Musacco believed the least restrictive environment for M.W. would be one that provides full-time supervision, and that his current placement was advantageous because the care providers there understand his vulnerabilities.

Addressing M.W.'s diagnosis, Musacco testified M.W. has a mild intellectual disability that occurred before he turned 18. This condition is chronic and lifelong and will not go away, even with appropriate services or medication. Musacco believes this results in M.W.'s intellectual ceiling being substantially depressed. M.W.'s pedophiliac disorder is chronic and lifelong as well, according to Musacco, and while his sexual urges may not change over time, they might diminish after the age of 40. Musacco also stated,

4.

however, that there is no way to predict definitively whether someone will reoffend as they get older.

Musacco concluded his testimony by noting he had evaluated M.W. annually for 12 years. Musacco believes it is not necessarily where he is placed, but the level of supervision M.W. is provided that is important. Recognizing he was about to turn 40, Musacco testified M.W. would have to honestly address his vulnerabilities with his therapist for there to be a change in the recommendation for his placement. He specifically believes M.W. can do better in treatment if he is more honest with himself and with his treatment providers about why he stares at children.

### 3. M.W.

Testifying on his own behalf, M.W. denied staring at children while on outings. He stated, however, that when encountering children during these outings, he would turn away on his own. M.W. acknowledged he was always with staff when on these outings, but believed he did not need their direction to remember to turn away from the children. He also testified that he was without supervision a couple of times when visiting family, without incident. M.W. expressed his desire to live independently in an apartment, and was willing to do that with staff being there "one-on-one," "24/7." M.W. felt this would be helpful in case someone made an unwarranted accusation. During cross-examination, M.W. admitted that staff would remind him to avert his eyes from children during outings, but insisted that he was not actually engaging in this conduct.

### 4. Trial Court's Ruling

On June 16, 2021, the trial court found that M.W. is a developmentally disabled person who is a danger to himself and possibly to others, as those terms are defined by sections 6500 and 6512. The court also concluded M.W.'s mental deficiency or disorder causes him to have difficulty controlling his dangerous behavior. Based on these findings, the court concluded the least restrictive alternative placement necessary to achieve the goals of treatment is a residential facility or group home.

## DISCUSSION

## I.     Substantial Evidence Supports the Trial Court's Findings

M.W. contends substantial evidence does not support his commitment under section 6500.  M.W. specifically points to a lack of evidence supporting the conclusions reached by the government's expert witness.  M.W. contends the expert witness's diagnosis of pedophilia is unsupported and that his developmental disability alone does not make him a substantial risk of danger to anyone, as is required by law.

### A.     Applicable Law

Section 6500, subdivision (b)(1) provides, "[a] person with a developmental disability may be committed to the State Department of Developmental Services for residential placement other than in a developmental center or state-operated community facility, … if the person is found to be a danger to self or others."  Case law has interpreted this language to require there be a showing that:

> "(1) he has a 'developmental disability' [citation], (2) he poses a 'danger to [him]self or others,' which can be established by a prior 'finding of incompetence to stand trial' during a prosecution for several felonies, including any 'felony involving death, great bodily injury, or an act which poses a serious threat of bodily harm to another person' [citations], and (3) his developmental disability played a 'substantial factor' in 'causing him … serious difficulty in controlling his … dangerous behavior.' " (*People v. Nolasco* (2021) 67 Cal.App.5th 209, 218 (*Nolasco*).)

Section 6500 defines a " 'developmental disability' " as a "disability that originates before an individual attains 18 years of age," and that can be expected to continue indefinitely, constituting a substantial disability for that individual.  (§§ 6500, subd. (a)(2), 4512, subd. (a)(1).)  A petition under section 6500 must also show proof of current dangerousness linked to the committed person's developmental disability.  (*In re O.P.* (2012) 207 Cal.App.4th 924, 932.)  Finally, the developmental disability must be a substantial factor in causing the person to have serious difficulty in controlling the behavior.  (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 106–107.)

6.

When conducting a substantial evidence review, "the appellate court 'must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576–577.)  To be substantial, the evidence must be " 'of ponderable legal significance … reasonable in nature, credible and of solid value.' " (*Id*. at p. 576.)  The issue of substantial evidence must be resolved after considering the entire record.  (*Id*. at p. 577.)

### B.    Application

Our review of the entire record leads us to conclude substantial evidence supports the trial court's finding that M.W.'s developmental disability was a substantial factor in his inability to control dangerous behaviors.  This conclusion is supported by the testimony of Musacco, who has evaluated M.W. for over 11 years on the issue of his placement.  Musacco specified he spoke to M.W., Coronado and M.W.'s therapist, and reviewed various reports addressing M.W.'s behavior over the course of the prior year.  Musacco concluded that M.W. has a developmental disability that impacts his ability to understand potential risks posed and the necessary and appropriate safety precautions that need to be taken.  Musacco believed this to be especially dangerous because his developmental disability makes it hard for M.W. to manage the urges brought on by an underlying pedophiliac disorder, which could lead to a substantial risk of "sexual reoffense."  Musacco concluded M.W. would need to be placed in a community care facility, which would provide a safety net and supervision allowing him to function in the community, without putting others at risk.

The testimony provided by Musacco puts into context the earlier testimony provided by Coronado, the group home administrator, who testified to the numerous times M.W. had to be redirected when on "outings" when he would be caught staring for prolonged periods of time at very young children, requiring he be redirected and told to focus his attention elsewhere.  These instances of "prolonged staring" were documented

in several daily progress logs entered into evidence. One particular notation documents an incident where inappropriate pictures of a very young girl were found on a USB drive in M.W.'s possession, resulting in his losing computer privileges for a period of time. Another incident noted involved M.W. getting anxious while watching a family with a young boy in a doctor's office. This required the staff to take M.W. out of the waiting room so he could calm down.

In his appellate brief, M.W. argues substantial evidence does not exist because Musacco never made the connection of M.W.'s dangerousness to his developmental disability. A series of cases are cited for the proposition that "mental retard[ation]" alone cannot support a finding of "dangerousness." However, that is not what happened here. Musacco specifically made the connection between M.W.'s developmental disability and his inability to control his urges fueled by a pedophiliac disorder, and the potential risk posed to others. Moreover, if a person with a developmental disability is already in the care or treatment of a facility at the time a petition for commitment is filed, proof of a recent overt act while in that facility is not required to support a finding the person is a danger to himself or others. (§ 6500, subd. (b)(3).)

Musacco, who both parties accepted as an expert in this field, provided his assessment that M.W. met the criteria laid out in section 6500. Musacco's conclusions were not speculative, but were backed up by the testimony offered by Coronado and the evidence provided in the various daily progress logs entered into evidence, documenting M.W.'s conduct while on outings outside the group home. It is not our role at this stage to second guess the trial court's reasonable factual inferences. (*People v. Cuevas*, *supra*, 213 Cal.App.4th at pp. 106–107.)

Again, we are required to review the entire record and provide deference to the judgment below. (*People v. Johnson*, *supra*, 26 Cal.3d at pp. 576–577.) Substantial evidence supports the trial court's conclusion M.W.'s developmental disability causes

him to have difficulty controlling his dangerous behavior, and thus creates a substantial risk of serious physical harm to himself or others within the meaning of section 6500.

## II.    M.W.'s Right to Equal Protection Was Not Violated

M.W. contends that because his commitment expires on the anniversary of the last order, rather than the anniversary of the first time he was committed, his right to equal protection has been violated.  To make this argument, M.W. notes that when individuals have been found mentally unfit to stand trial, each commitment ends on the anniversary of that first commitment, not the anniversary of subsequent orders recommitting the individual.  (See § 5008, subd. (h)(1) [discussed in the case of *Conservatorship of Murphy* (1982) 134 Cal.App.3d 15 and often referred to as a "*Murphy* conservatorship"].)  In contrast, M.W.'s commitment under section 6500, expires one year after the last order of commitment.  This often results in commitments under section 6500 being reviewed later than those under section 5008, and more prolonged commitments as a practical matter.

This issue was addressed recently in *Nolasco*, *supra*, 67 Cal.App.5th at p. 223, which concluded the differences between these two forms of commitment survive an equal protection challenge.  Applying a rational basis test, the *Nolasco* court stated *Murphy* conservatorships address mental illness which is often treatable and temporary.  These conditions can be " 'intermittent or short lived.' " (*Id.* at p. 222.)  Those who are subject to section 6500, have a developmental disability, which appears early in life and does not recede.  (*Ibid.*)  The court felt because mental illness can be fleeting, there is a need to have commitments reviewed "sooner rather than later." (*Id.* at p. 223.)  As a result, the "differential treatment between the end date for the period of recommitment under section 6500 and under a Murphy conservatorship withstands rational basis scrutiny." (*Id.* at pp. 225–226.)

We agree with the court in *Nolasco*, and find no reason to revisit the issue here.  M.W.'s right to equal protection was not violated.

9.

**DISPOSITION**

The judgment is affirmed.  In the interest of justice, all parties shall bear their own costs on appeal.