Filed 6/8/23  P. v. D.T. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>D.T.,<br><br>        Defendant and Appellant. | E078630<br><br>(Super.Ct.No. FELSB21000037)<br><br>OPINION |

APPEAL from the Superior Court of San Bernardino County.  Lorenzo R. Balderrama, Judge.  Affirmed.

Barbara A. Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, and Melissa Mandel and Genevieve Herbert, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant D.T. is intellectually disabled, with an IQ of 61.  He has a lengthy history of arrests, including arrests for violent crimes such as battery and assault with a

1

deadly weapon.  Most recently, he was arrested for assaulting his sister with a knife; however, he was found incompetent to stand trial.

The People filed a petition to involuntarily commit defendant as developmentally disabled and dangerous to himself or others.  (Welf. & Inst. Code, § 6500 et seq.)[1]  After a bench trial, the trial court granted the petition.

Defendant contends that there was insufficient evidence that he was dangerous.  He points out that there was no evidence that he had ever *actually* inflicted any *serious* physical injury.  It is sufficient, however, that he was *likely* to inflict serious physical injury; and of that, there was ample evidence.

I

STATEMENT OF THE CASE

In 2018, the People filed a complaint charging defendant with assault with a deadly weapon.  (Pen. Code, § 245, subd. (a)(1).)  He was found incompetent to stand trial.  He was placed on out-patient status, under the control of the Inland Regional Center (IRC).  However, he did not comply with the IRC, so he was committed to Porterville Developmental Center (Porterville).

In 2020, Porterville certified that there was no substantial likelihood that defendant would become competent to stand trial in the future.  Thus, in 2021, the People filed a

_____

**1**     All further statutory citations are to the Welfare and Institutions Code unless otherwise indicated.

2

petition to commit defendant as developmentally disabled and dangerous. The trial court dismissed the criminal complaint.

On March 7, 2022, after a bench trial, the trial court granted the petition and committed defendant for up to one year.

II

MOOTNESS

The People contend that this appeal is moot because defendant's commitment expired after one year, i.e., on March 7, 2023. (See § 6500, subd. (b)(1)(A).)

Supreme Court authority establishes that once a section 6500 commitment expires, an appellate challenge to it is moot. (*In re O.P.* (2012) 207 Cal.App.4th 924, 927 (*O.P.*); accord, *People v. Sweeney* (2009) 175 Cal.App.4th 210, 214 [Fourth Dist., Div. Two].)

D.T. argues that it is not moot, citing our opinion in *People v. J.S.* (2014) 229 Cal.App.4th 163 [Fourth Dist., Div. Two] (*J.S.*).) *J.S.* did not involve a section 6500 commitment. Rather, J.S. had been committed as a mentally disordered offender (MDO). (*Id*. at pp. 166-167.) She sought judicial review in the trial court under Penal Code section 2966, subdivision (b). (*Id*. at p. 167.) When her commitment expired, the trial court dismissed the judicial review proceeding as moot. (*Id*. at p. 169.)

We held that the judicial review proceeding was not moot. (*J.S.*, *supra*, 229 Cal.App.4th at pp. 170-174.) We explained that "[e]ven after the expiration of the initial commitment, . . . the initial determination of whether an offender qualifies as an MDO continues to have practical effects." (*Id*. at p. 170.) We relied on two specific aspects of

3

an MDO commitment, namely that "if an offender's initial commitment is improper, any extended commitment would also be improper," and that "to continue an offender's commitment, the People need only make a showing regarding the three [dynamic] criteria . . . , while it is assumed that the initial showing with respect to the static factors remains valid." (*Id*. at p. 171.)

A section 6500 commitment is different. First, a committee can be recommitted regardless of whether the initial commitment was valid. Second, "[i]f subsequent petitions are filed, the procedures followed shall be the same as with the initial petition for commitment." (§ 6500, subd. (b)(1)(B).) Accordingly, *J.S.* is not controlling. Instead, we must follow *O.P.* and conclude that the appeal is moot.

Ordinarily, mootness requires dismissal. However, we have "discretion to decide [an] otherwise moot appeal" when "the case raises important issues capable of repetition but likely to evade review . . . . [Citation.]" (*Conservatorship of Eric B.* (2022) 12 Cal.5th 1085, 1094, fn. 2.) This approach is particularly warranted when, as here, the "duration [of the challenged order] is short, compared to the appellate process." (*Conservatorship of K.P.* (2021) 11 Cal.5th 695, 705, fn. 3.) Defendant's appellate counsel represents to us that a recommitment proceeding is pending.

The People argue that the particular issue that defendant is raising — the sufficiency of the evidence to support the commitment — is not likely to recur. They cite *People v. Alvas* (1990) 221 Cal.App.3d 1459 (*Alvas*), disapproved on other grounds in *People v. Barrett* (2012) 54 Cal.4th 1081, 1105-1106, 1109. In *Alvas*, the court *reversed*

4

a recommitment under section 6500, because the defendant had not been advised of his right to trial by jury.  (*Id*. at pp. 1462-1465.)  It then declined to decide whether there was sufficient evidence to support the commitment.  It explained that the issue was moot: "Whether the evidence for . . . recommitment was or was not sufficient, no relief is now available since the period[] for the . . . recommitment order[] ha[s] expired.  Moreover, it seems unlikely that identical or nearly identical facts will arise as a basis for other proceedings; consequently any question regarding sufficiency of the evidence is moot." (*Id*. at p. 1468.)

Here, by contrast, it seems likely that the same facts will be the basis for the recommitment proceeding.  As we will discuss in more detail in part IV, *post*, the evidence offered to support the commitment included defendant's criminal history and his history of misconduct while at Porterville.  While there will be an additional year or two's worth of conduct available by the time there is a trial in any recommitment proceeding, surely the same (or similar) evidence will be introduced again.

In any event, the application of the "capable of repetition but evading review" exception to dismissal is discretionary.  We choose to exercise our discretion differently that the *Alvas* court.  Although the appeal is moot, we decline to dismiss it.

III

STATEMENT OF FACTS

A.    *People's Evidence*.

Defendant was 31 when he was committed.

5

Dr. Mayo Arai Kennedy, a psychologist, worked at Porterville as head of the Forensic Assessment Team. In her opinion, defendant had a mild intellectual disability. His IQ was 61. He had been diagnosed when he was two.

Defendant had difficulty doing activities of daily living by himself — such as changing his clothes or "taking care of his hygiene" — but he could do them if prompted. Due to poor oral hygiene, he had missing and broken teeth. A dentist reported that none of his upper teeth could be saved — they should all be pulled. Nevertheless, he did not want any dental treatment.

Defendant also had "difficulties in maintaining appropriate behavior . . . ." He had an "extensive history" of "problematic and maladaptive behaviors," including "impulsivity, emotional outbursts, paranoia, property destruction (doors, holes in walls, breaks windows), [s]elf-[i]njurious [b]ehavior (superficial scratches to arms) and suicidal ideations and attempts (jumping off a bridge and attempted overdose), oppositional defiance (with authority figures, peers, roommates), non-compliance with programming and rules, inappropriate sexual behavior (especially towards female housemates), manipulation, verbal aggression (cursing and threats), [and] physical assault and battery (toward housemates, family, and neighbor)."

Defendant had a history of school suspensions "due to conflicts with peers." As a juvenile, he was arrested for "vandalism, petty theft, setting a field on fire, and trashing a school."

As an adult, defendant was arrested 12 times, including twice for assault with a deadly weapon, twice for battery, twice for brandishing a deadly weapon, and once for possession of a dangerous weapon.[2] In 2017, he was convicted of brandishing a deadly weapon (as a lesser offense of assault with a deadly weapon). In 2018, he was charged with assault with a deadly weapon because "he made a threat with a knife." He also had "numerous" probation violations and failures to appear. In 2019, while in jail, defendant put a razor in his mouth and threatened to swallow it.

After his admission to Porterville in August 2020, defendant had "difficulty adjusting." He was on medication, including Haloperidol, valproic acid, and Benztropine, but sometimes he refused to take it. Between August 2020 and August 2021, he had 86 episodes of "socially inappropriate behavior," including "yelling, screaming, cursing at others, refusing programs, becoming argumentative, [and being] noncompliant [with] treatment . . . ."

Defendant also had episodes of physical aggression. In the following four instances, Porterville staff had to resort to "highly restrictive interventions" (HRIs). HRIs could include being held against the wall by three or four staff members ("wall containment") or being restrained in a bed with a five-point harness ("five-point restraint"). HRIs are used only "when the client shows clear and present danger to self or others."

---

[2] Defendant did not object to the evidence of arrests below, and he does not argue that evidence of arrests (rather than convictions) was inadmissible or irrelevant to prove the commission of the underlying crimes. We deem any such argument forfeited.

On August 13, 2020, defendant refused to go inside and wash up for dinner. He screamed and swore at staff. Once in his room, he threw things across the floor. He balled up his hands into fists and "lunged" at a staff member. Staff members "captured" him and placed him in wall containment. He remained "combative" and threatened to harm staff members, so he was placed in five-point restraint.

On August 27, 2020, defendant got upset because he was not allowed to attend a recreational activity. He yelled and cursed. While "in a fighting stance with clenched fists toward staff," he said, "[W]hat the fuck you gonna do cause I know what the fuck I'm gonna do!" He also threw a hairbrush at a staff member but missed. He was placed in wall containment, but "he continued to struggle[,] attempting to break free," so he was placed in five-point restraint.

On October 26, 2020, defendant refused to go back inside after a fresh-air break. He moved toward a staff member, "suddenly clos[ing] space in an aggressive manner" and said, "What are you going to do about it[?]" Inside his room, he continued to curse. He clenched his fists and punched his bed, saying, "[Y]a'll don't know who you fucking with." He then "suddenly turned toward staff and lunged with clenched fists." Staff members "evad[ed]" him and managed to "capture" him. He was placed in wall containment. "He attempted to free himself, kicking [and] yelling 'fuck you.'" He was then placed in five-point restraint.

On February 9, 2021, defendant got upset for reasons that were not apparent and that he would not explain. He "momentarily postured with [two] clenched fists and

8

lunged at staff." He was placed in wall containment, but he "struggled wildly" and yelled, "I'm going to get you[,] just wait." He was then placed in five-point restraint.

Defendant also had the following four episodes of physical aggression that did not require HRIs.

On September 17, 2020, defendant and another patient were arguing. Defendant said, "What, you want to fight?" They squared up to fight, but staff stopped them.

On November 12, 2020, defendant started an argument with another patient. They took their shirts off. The other patient threw the first punch; defendant punched back, hitting the other patient's ear, then ran away.

On June 12, 2021, defendant and another patient squared off to fight, but staff members stopped them.

On November 13, 2021, defendant started a "verbal altercation" with other patients, which became a "physical altercation" when defendant threw the first punch. Staff members stopped the fight.

In Dr. Kennedy's opinion, defendant was a danger to himself or others, mainly because "[h]e had difficulty controlling his behavior when he was upset." "He required a lot of verbal prompts and staff support. And with that staff . . . support and encouragement, he came back [to] normal . . . ." However, he could not come back to normal on his own. In the absence of "support and services," "socially inappropriate behavior can become physical aggression." She opined that his intellectual disability

was a substantial factor in causing him serious difficulty in controlling his dangerous behavior.

B.    *Defendant's Evidence*.

Defendant testified that he was in Porterville as a result of running away from a group home "because [he] didn't like the rules." He did not want to live at Porterville, because people there picked on him. Two or three times, people hit him, then ran away. He told the staff, but they did not do anything. He had yelled and cursed at staff members because they did not do their jobs. He admitted that he did not get along with other patients. He also admitted having attempted suicide.

If defendant got upset, he talked to the staff or went to his room. He testified that he had never hit a staff member; he denied ever taking a fighting stance toward a staff member or ever starting a fight. He only tried to defend himself. He had gotten into trouble in the community only because he defended himself.

Defendant denied having convictions for battery or vandalism;[3] he denied ever being on probation. Once, he was arrested for having a knife, but the officer took the knife away and let him go. He went to jail because, during a drunken argument with his sister, he pulled out a knife, and was "going to stab" her. Now, he was "done" with alcohol. If someone in the community made him angry, he would "ignore them and walk away."

---

**3**      Evidently this was true; the record shows arrests for battery and vandalism but not convictions.

10

IV

THE SUFFICIENCY OF THE EVIDENCE

Defendant contends that there was insufficient evidence that he was a danger to himself or others.

"An individual may be civilly committed under section 6500 only if the People prove that (1) he has a 'developmental disability' [citation], (2) he poses a 'danger to [him]self or others,' . . . and (3) his developmental disability played a 'substantial factor' in 'causing him . . . serious difficulty in controlling his . . . dangerous behavior' [Citation.] [¶] For this purpose, a developmental disability . . . includes intellectual disabilities. [Citation.]" (*People v. Nolasco* (2021) 67 Cal.App.5th 209, 218.)

"[T]he People must prove the defendant's conduct presents a likelihood of serious physical injury to himself or others." (*People v. Hartshorn* (2012) 202 Cal.App.4th 1145, 1152; see also *id*. at pp. 1152-1154.) "[E]motional injury, mere apprehension of physical injury, speculation and conjecture are not enough to justify the need for commitment." (*Id.* at p. 1154.)

Section 6500 also provides: "'Dangerousness to self or others' shall include . . . a finding of incompetence to stand trial . . . if the defendant has been charged with" an enumerated crime, including "a felony involving . . . an act that poses a serious threat of bodily harm to another person." (§ 6500, subd. (a)(1).) The People therefore argue that it is sufficient evidence of dangerousness that defendant was charged with assault with a deadly weapon and found incompetent to stand trial. However, it has been held that this

11

provision violates due process, because it does not require proof of current dangerousness. (*O.P.*, *supra*, 207 Cal.App.4th at pp. 932-934.)**4**  Hence, we do not rely on it here.

"In conducting a substantial evidence review, 'the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.]' [Citation.]  To be substantial, the evidence must be "'of ponderable legal significance . . . reasonable in nature, credible and of solid value.'" [Citation.]  The issue must be resolved in light of the entire record.  [Citation.]" (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 106-107.)

While in the community, defendant was repeatedly arrested for violent crimes, including assault with a deadly weapon, battery, and brandishing a deadly weapon.  In 2018, during an argument with his sister, he admittedly was "going to stab" her.

After his admission to Porterville in August 2020 and up to the end of trial in December 2021 — a period of 16 months — defendant was physically aggressive eight times.  He threatened staff with physical harm, saying, "And what the fuck you gonna do cause I know what the fuck I'm gonna do!" and "I'm going to get you[,] just wait." Three different times, he clenched his fists, then lunged toward staff members.  Although he did not make contact, staff members evidently felt themselves in danger, such that

---

**4**      Unhelpfully, even though the People are making an argument that *O.P.* squarely refutes, neither side cites *O.P.*

12

they had to capture him and put him under restraint. Four times, he prepared to fight another patient. Once, he threw the first punch. Another time, the other patient threw the first punch, but defendant was ready and willing to fight and punched him back. Admittedly, the remaining two times, no punches were thrown, but inferably that was only because staff intervened. And all of this was despite his being on medication and in a highly restrictive environment.

In short, defendant has (1) violent impulses and (2) poor impulse control. The trial court could reasonably conclude that he was dangerous to himself and others.

Defendant argues that there was no evidence that he had inflicted any physical injury. However, nothing in section 6500 requires that a defendant have *already* inflicted serious physical harm; it requires only "the *potential* for 'infliction of [serious] physical harm.' [Citations.]" (*Alvas*, *supra*, 221 Cal.App.3d at p. 1467, italics added.) The law does not allow a dog a first bite before it will be considered dangerous (*Chandler v. Vaccaro* (1959) 167 Cal.App.2d 786, 789); likewise, it does not allow a human a first wound.

Dangerousness can also consist of the potential to inflict serious physical harm on *oneself.* On defendant's logic, a person could not be committed on this theory until he or she has *already* inflicted serious physical harm on him or herself. This would seriously hinder the protective purpose of the law.

Defendant also argues that he engaged in socially inappropriate behavior far more often (86 times) than in physical aggression (8 times). However, even if we take his

13

socially inappropriate behavior completely out of the picture, his physical aggression alone is sufficient to support the trial court's finding. His socially inappropriate behavior is simply additional evidence of poor impulse control.

We therefore conclude that there was sufficient evidence that defendant was dangerous to others within the meaning of section 6500.

## V

## DISPOSITION

The order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ _____
P. J.

We concur:

McKINSTER _____
J.

RAPHAEL _____
J.

14